Chief Judge Fuld.
The six defendants in this case were charged with criminal contempt (former Penal Law, § 600, subd. 6) for refusing to answer questions during an investigation by a New York County Grand Jury after they had been granted immunity. After unsuccessfully attempting to challenge the informations, in both the Federal and State courts, on the ground that the Grand Jury was unlawfully constituted, the defendants were tried and convicted in the New York City Criminal Court and their convictions were unanimously affirmed by the Appellate Term. On this appeal, they argue, among other things, that the Constitution requires all juries to be drawn from a cross section of the community and that the underrepresentation of certain minority groups on the New York County Grand Jury List rendered their convictions invalid.
In December of 1964, each of the defendants was called to appear as a witness before a Grand Jury of New York County, which was conducting an investigation into the activities of three individuals—not the defendants—who were suspected of having played a major role in a series of riots that had occurred in the summer of 1964.[1] The defendants were regarded as ‘1 lesser figures in the conspiracy [who had taken] their directions ” from others and, before calling them to the stand, the Grand Jury voted to grant them immunity so that they could obtain the evidence needed against the major suspects.
*485 When the defendants were called to testify, the District Attorney informed them of the Grand Jnry’s decision to grant them immunity and of the fact that they could be held in contempt if they refused to testify. Despite these monitions, however, each refused to answer several questions and persisted in his refusal after the foreman of the Grand Jury, at the request of the District Attorney, directed him to respond.[2] As a result, on March 8, 1965, the Grand Jury, with the approval of the Supreme Court, directed the District Attorney to file in the New York City Criminal Court an information against each defendant, charging him with several counts of criminal contempt (N. Y. City Grim. Ct. Act, § 42, subd. [1]).
The defendants then sought to remove the case to the United States District Court, claiming that the “great majority of qualified Negro and Puerto Bican citizens ” were excluded from service on grand juries in New York County and that they were, therefore, “ denied * # * a right under * * * law[s] providing for the equal [protection of] civil rights of citizens of the United States ” (U. S. Code, tit. 28, § 1443, subd. [1]). The District Court decided that it lacked jurisdiction to try the case and, on appeal, the Court of Appeals for the Second Circuit affirmed that decision (Chestnut v. New York, 370 F. 2d 1, cert. den. 386 U. S. 1009). In so doing, however, the court noted that the defendants had raised “ serious constitutional issues ” concerning the State’s grand jury selection process (370 F. 2d, atp. 7).
Beturning to the State courts, the defendants applied to the Supreme Court, New York County, “ for an order revoking [its] approval ” of the Grand Jury’s directive to file the informations *486 against them. An extensive hearing was conducted in which the court examined, in detail, the methods and procedures employed for the empanelling of grand juries in New York County. In particular, several officials of the County Clerk’s office explained how they compiled the annual list of persons “ suitable to serve as grand jurors ” which they were required to submit to the County Jury Board (Judiciary Law, § 609, subd. I).[3] Their testimony demonstrated that most of the persons on that list had qualified and served as grand jurors in previous years. It further appeared that the names of additional persons were obtained, as vacancies occurred, from the County Clerk’s list of petit jurors. This was accomplished with the aid of a computer, programmed to eliminate the names of government employees and of persons under 35 years of age and over 65. All others on the petit jury list who had established a satisfactory record of attendance as trial jurors were sent letters enclosing application forms and inviting them to serve as grand jurors. Response to the letter solicitations was poor, only about one third of the persons contacted even troubling to respond.[4] Appli *487 cations were also received from persons ' who, unsolicited, appeared at the County Clerk’s office, as well as from individuals referred to the office by other grand jurors, the County Grand Jury Association and judges.
The applicants were each requested to appear at the clerk’s office for a personal interview at which an official would explain the duties and function of grand jurors and verify the answers on the questionnaire which all prospective jurors in New York City are required to fill out (Rules of Jury System of City óf New York, 22 NYCRR 620.2, 620.18). On the basis of (1) the questionnaire, (2) a credit report and (3) the applicant’s criminal record, if any, the County Clerk’s office would then decide whether or not the applicant’s name should be submitted. All persons on relief and persons against whom judgments of divorce on the grounds of adultery had been entered were rejected, along with those who did not meet the express statutory qualifications contained in section 596 of. the Judiciary Law. One statutory provision, which, however, was not enforced, was the requirement—since repealed (L. 1967, ch. 49, § 1)—that a juror own property worth in excess of $250. In the year 1964, 144 new applicants were rejected and the-remaining applicants, numbering about 200, were added to the list of about 2,000 jurors who had already qualified as grand jurors. Throughout this selection process, the testimony demonstrates, there was no intent or desire to exclude, members of minority groups from this list, although it did contain a very small percentage of Negroes and English-speaking Puerto Ricans in relation to their proportion of the population.[5]
Based on the evidence presented, the court at Special Term denied the defendants’ motion, stating that “ ‘ [w]ant of proportional representation of groups not proven to be deliberate and intentional is not constitutionally offensive.’ (Froessel, J., in People v. Agron, 10 N Y 2d 130, 141, citing Fay v. New York, 332 U. S. 261, 291; Akins v. Texas, 325 U. S. 398, 403.) ”
*488 Finally, in May of 1967, more than two years after the filing of the information against them, the defendants were brought to trial before a three-judge court in the Criminal Court. The trial consisted, almost entirely, of readings from the transcript of the Grand Jury minutes, and, on the strength of that testimony, each of the defendants was convicted on one or more counts and received sentences ranging from probation to six months in the workhouse. As already noted, their convictions were unanimously affirmed by the Appellate Term.
In evaluating the defendants’ argument that the Grand Jury was illegally constituted, it is important to point out that the defendants—who, with exception of the defendant Chestnut, are white — do not claim that they have any evidence that the lack of equal representation by racial minorities on the Grand Jury was the result of a policy of purposeful and intentional exclusion, a course of conduct which would not only violate the Constitution but would render the officials of the County Clerk’s office subject to criminal penalties as well (Civil Bights Law, § 13). Bather, they maintain that, regardless of intent or motivation, the State had an affirmative duty to provide a jury which was made up of a cross section of the community and that the lack of equal representation, whatever its cause, deprived them of their constitutional rights. More .specifically, it is the defendants’ contention that “ [t]he constitutional command for a jury of peers is not merely negative, forbidding active discrimination, [but] It enjoins an affirmative duty upon the state to provide such a jury. ’ ’
As the defendants recognize, this argument is at odds with our past decisions; in order to sustain a claim of an illegally constituted jury, it is essential, we have held, that intentional and systematic discrimination must be proved and that a showing of mathematical disparity, without more, is insufficient to meet this burden. (See, e.g., People v. Horton, 18 N Y 2d 355, 359-360, cert. den. 387 U. S. 934; People v. Agron, 10 N Y 2d 130, 141, cert. den. 368 U. S. 922; People v. Dessaure, 299 N. Y. 126, cert. den. 337 U. S. 949.) Thus, for example, in the Horton case (18 N Y 2d 355, supra), the defendant had made a claim similar to that advanced by these defendants, based upon the fact that there was only one Puerto Bican on the panel from *489 which his trial jury was chosen. Noting that, according to the census, some 13.4% of the county’s population was of Puerto Bican origin, we wrote (p. 360):
“ This does not, of itself, indicate a prima, facie denial of equal protection. Since there is no evidence of any deliberate, intentional or systematic exclusion of any particular race, appellant’s position is u/ntenable. (People v. Agron, 10 N Y 2d 130, 140-141 [1961].) Our ruling in Agron, equally applicable here, was that a mere showing of imbalance on one particular jury panel does not, without more, demonstrate a denial of a particular defendant’s right to equal protection. Here there is neither direct evidence of exclusion of a particular racial group nor evidence of a long-continued pattern of exclusion which prompted the United States Supreme Court’s determinations in Patton v. Mississippi (332 U. S. 463 [1947]), and Norris v. Alabama (294 U. S. 587 [1935]). (See Hoyt v. Florida, 368 U. S. 57 [1961].) ” (Emphasis supplied.)
The defendants, however, point out that the United States Supreme Court has, in recent rulings,. considered statistical disparity in passing upon claims of discrimination in the selection of jurors. (See Turner v. Fouche, 396 U. S. 346, 357-360; Whitus v. Georgia, 385 U. S. 545, 550-552.) From this, they would have us decide that a showing of disproportion in representation is all that is necessary to sustain such a claim. We do not read the Supreme Court’s decisions in this way. Study of them indicates that, although a statistical disparity may be used, along with other factors, as evidence in support of a claim of purposeful discrimination, it is not a ground, in itself, for concluding that a jury is impermissibly constituted.
In the Whitus case (385 U. S. 545, supra), for example, the appellants, in addition to showing a substantial statistical disparity in the representation of Negroes on the jury panel, also established that' the names of jurors had been drawn from tax digests which listed Negroes separately from whites. In the court’s view, it was the combination of these two factors which “ constituted a prima facie case of purposeful discrimination ” *490 (385 U. S., at p. 551; emphasis supplied). Similarly, in Turner (396 U. S. 346, supra), it was shown that a substantial statistical disparity had arisen at the one point in the selection process in which the jury commissioners were called upon to use their subjective judgment. In particular, the evidence indicated that 171 out of 178 jurors rejected on grounds that they were not “upright” and “intelligent” were Negroes. The court’s conclusion was not that the jury was unlawfully constituted per se but that the appellants had “ thereby made out a prima facie case of jury discrimination” which the State failed to overcome (396 U. S., at p. 360).
In the present case, the District Attorney asserts, and it is not denied, that the principal cause for the underrepresentation of minority groups on grand juries in New York County is the reluctance of the members of those groups to volunteer for jury duty. Although this is unfortunate,[6] it does not establish that there has been any unconstitutional discrimination against the members of those groups by those involved in the selection process. Nor does the Constitution require, as the defendants maintain, that the present voluntary system he abandoned and replaced by a compulsory system to insure that Negroes will be fully represented on grand jury panels whether they wish to be or not.
The County Clerk’s office did, it is true, intentionally exclude welfare recipients, persons adjudged guilty of adultery and persons under the age of 35, and this, the defendants insist, constitutes invidious discrimination even under the traditional standard. We may not, however, say that any of these criteria is so totally lacking in reasonable justification as to render it unconstitutional. The 35-year age limit, for example, was used in the computerized selection of names from the list of trial jurors only as a convenient means of eliminating those who were not likely to have the requisite experience as petit jurors to evaluate the degree of evidence which ‘ ‘ would, if unexplained or uncontradicted, warrant a conviction by the trial jury” *491 (Code Grim. Pro., § 251). The age limit was not applied where the names came from judges or other sources. Persons adjudged guilty of adultery were eliminated on the ground that it constituted evidence of moral turpitude, a ground which is not seriously challenged by the defendants. As for the practice of excluding welfare recipients — a practice which has since been discontinued — it was apparently founded upon an assumption, which may have been erroneous, that it was unlawful for people on welfare to receive money from other governmental sources. Be that as it may, there is no basis for an inference that this criterion was used as a means of discriminating against poor people.
In sum, the record, taken as a whole, establishes that the County Clerk and his staff tried diligently to fulfill their statutory duty to select grand jurors who are ‘ ‘ intelligent; of sound mind and good character [and] well informed ” (Judiciary Law, § 596, subd. 6 [renum. subd. 5 by L. 1967, ch. 49]). By choosing jurors on the basis of these factors, rather than race or ethnic background,, their actions were clearly consistent with the policies embodied in the Equal Protection Clause. As the Supreme Court only recently reaffirmed (Carter v. Jury Comm., 396 U. S. 320, 332), “The States remain free to confine the selection [of jurors] to citizens, to persons meeting specified qualifications of age and educational attainment, and to those possessing good intelligence, sound judgment, and fair character.”
In addition to their challenge to the composition of the Grand Jury before which they were called, the defendants raise several additional arguments for reversal, only one of which has merit. All but one of the defendants were convicted on multiple counts of contempt, even though each of them made it perfectly clear, at the outset, that he would not answer any questions concerning the alleged conspiracy. The District Attorney multiplied the counts by asking them several questions, all of which were related to statements made by one of the suspects at a meeting held on July 30,1964. In this respect, the case closely resembles People v. Riela (7 N Y 2d 571), in which we held that a witness’ statement, after being granted immunity, that he would not answer questions about a particular subject — in that case the notorious *492 "Apalachin" meeting - constituted a single act of contempt, regardless of the number of questions put to him.[7]
The sentencing judges in the case before us, apparently recognizing that the defendants were guilty of only a single act of contempt, directed that the sentences imposed on each of the several counts were to run concurrently. It may well be that the imposition of concurrent sentences eliminated any actual prejudice to the defendants but proper application of the rule required the court to find the defendants guilty of but a single contempt, sentence each of them for that crime and dismiss all the other counts. This result may be accomplished, without the necessity of remanding for resentencing, by simply modifying the judgment.
Before bringing this opinion to a close, we discuss briefly one other point which the defendants raise. Since the questions put to them related to their own conduct, they insist that they were really "targets" of the Grand Jury’s investigation and as such could not be compelled to testify even though granted immunity. Their argument is based upon our decision in People v. De Feo (308 N. Y. 595) which—though subsequently overruled (see People v. Ianniello, 21 N Y 2d 418, cert. den. 393 U. S. 827; see, also, People v. Tomasello, 21 N Y 2d 143) —was still in effect at the time they refused to testify. However, what the defendants overlook is that the cases relied upon were concerned with the question whether a prospective defendant who had not been granted the complete immunity conferred by section 2447 of the former Penal Law could be held in contempt for his refusal to answer questions. In a case such as the present, where there has been entire compliance with the immunity statute, it has always been the rule that any witness, whether or not a ‘ ‘ target ’ ’ of the investigation, could be required to testify and be subjected to prosecution for contempt should he willfully *493 refuse to do so. (See, e.g., Matter of Gold v. Menna, 25 N Y 2d 475, 482; People v. Breslin, 306 N. Y. 294, 297.)
In conclusion, then, the defendants willfully refused to testify before a Grand Jury after they had been offered a complete grant of immunity in accordance with the statute. The Grand Jury was a lawfully constituted body, chosen without regard to race or other discriminatory factors and, apart from the fact that—except in the case of the defendant Shallit who was adjudged guilty on only one count—thn single act of contempt which each defendant committed was artificially multiplied by repetitive questioning, their convictions were entirely proper.
The judgments appealed from should be modified in accordance with this opinion and, as ,so modified, affirmed.
Judges Burke, Scileppi, Bergan, Breitel, Jasen and Gibsof concur.
Judgment accordingly.

. One of the three suspects, William Epton, was eventually indicted and convicted of the crimes of conspiracy to riot and advocacy of criminal anarchy. (See People v. Epton, 19 N Y 2d 496, app. dsmd. and cert. den. 390 U. S. 29.) He subsequently instituted a habeas corpus proceeding in Federal court in which he raised the same arguments asserted by these defendants and was released on bail pending a determination of the question in the State courts. (See United States ex rel. Epton v. Nenna, 281 F. Supp. 388.)

. Under section 2447 of the former Penal Law, immunity is conferred upon a witness when the Grand Jury, at the request of the District Attorney, directs that witness, who has asserted his constitutional privilege, to answer questions put to him and he complies with that directive. It is to he noted that, as long as it follows the statutory formula, the Grand Jury has the power to order the witness to respond, and there is no need to obtain a further directive or order from the court. (See People v. Riela, 7 N Y 2d 571, 575.) Such court approval would, however, he required if the Grand Jury wished to compel an answer without granting immunity on the ground that the exercise of the privilege was “palpably not in good faith”. (People v. Ianniello, 21 N Y 2d 418, 425, cert. den. 393 U. S. 827.)

. Subdivision 1 of section 609 of the Judiciary Law reads, in part, as follows:
“1. Selection of grand jurors. The annual list of persons to serve as grand jurors at the terms of the supreme court for the trial of criminal actions within the city of New York * * * shall be made up in the following manner: the county clerk shall make special investigation of persons qualified to serve as trial jurors. The county clerk shall require each applicant for service as a grand juror to record the fingerprints of his two hands * * * Such fingerprints shall be promptly forwarded to the central bureau of criminal identification * * * with the request that all information on file as to the previous record, if any, of such person, be forthwith transmitted to the county clerk. * * * [T]he county clerk shall not place the name of such person upon the grand jury list if such person’s record contains a conviction for a felony or for a felony or for a misdemeanor involving moral turpitude. # # #
“ The county clerk shall make a list of those persons who, this investigation shows, are suitable to serve as grand jurors. * * * The annual grand jury lists shall be selected therefrom by the respective county jury boards.”

. Many of the applicants responding, the record indicates, did so only because of a mistaken belief that they had been effectively summoned and were required to respond. Many others proceeded no further on learning of the demands which service on the Grand Jury would make upon their time, a factor which undoubtedly contributed to the relatively high proportion of “retired” persons among those ultimately selected to serve.

. For example, of the 1,999 persons on the 1964 list whose race could be identified, only 33, or about 1.6% were Negro, despite the fact that, according to the 1960 census, Negroes comprised 24% of the county’s adult population. Similar disparities existed in the representation of poor people, blue collar workers and persons who never attended college.

. It is a source of some satisfaction to note that efforts, conducted by the New York County Clerk’s office since 1964, to increase the participation of minority groups on grand juries have met with considerable success.

. “ What is of significance ”, we wrote in the Riela case (7 N Y 2d 571, 576, supra), “is that it was apparent from the very start of his interrogation that Riela, relying upon the privilege, would decline to answer any question bearing on the ‘ Apalachin meeting ’, and that the questions, different though they were from one another, all related to that one subject. This being so, he is guilty of the single contempt of refusing to give testimony concerning the Apalachin gathering, rather than 17 contempts for refusal to answer individual questions about it.”