UNITED STATES of America ex rel. Otis CHESTNUT et al., Appellants,

v.

CRIMINAL COURT OF the CITY OF NEW YORK, George F. McGrath, Commissioner of Corrections of the City of New York, and Frank S. Hogan, District Attorney of New York County, Appellees.

No. 717, Docket 35650.

United States Court of Appeals, Second Circuit.

Argued April 13, 1971.

Decided May 5, 1971.

Basil R. Pollitt, New York City (Sanford M. Katz, New York City, of counsel), for appellants.

David Otis Fuller, Jr., Asst. Dist. Atty. (Frank S. Hogan, Dist. Atty. New York County, Michael R. Juviler, Asst. Dist. Atty., of counsel), for appellees.

Before WATERMAN, SMITH and KAUFMAN, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

Petitioners, appealing from the denial of a writ of habeas corpus, have fashioned a wide-ranging challenge to the constitutionality of the New York County (Manhattan) grand jury selection system as it operated in 1964.

Appellants were prosecuted and convicted for criminal contempt upon the recommendation of the Second August 1964 Grand Jury, for refusing to answer questions put to them by that grand jury. Their primary defense at trial was that the jury was unrepresentative of the population of the local community in several respects, and hence that the prosecution denied them due process and equal protection of the law. Extensive factual hearings were conducted concerning ground jury selection practices. Petitioners' convictions in the New York City Criminal Court were unanimously affirmed by the New York Court of Appeals on the ground that the departures from perfect representativeness demonstrated below did not result from unconstitutional exclusionary practices. People v. Chestnut, 26 N.Y.2d 481, 311 N.Y.S.2d 853, 260 N.E.2d 501 (1970) (Fuld, Chief Judge).

Appellants' habeas corpus petition raised substantially the same claim of unrepresentativeness. On October 5, 1970, Judge Tyler denied the petition without conducting a hearing. We affirm.

## I.

The grand jury under attack was convened to investigate serious civil disturbances that had broken out in Harlem during the preceding month. Petitioners were called to testify and granted immunity from any prosecution related to the occurrences under investigation. The grand jury requested simple "yes" or "no" answers to a series of questions concerning three targets of the investigation and suspected plans to instigate rioting by sniper fire. Two of the five petitioners requested a judicial ruling on the relevance and legality of the questions. A Justice of the Supreme Court, New York County, declined the request on the ground that petitioners were ably represented by counsel. Petitioners then refused to answer the questions, and the grand jury directed the district attorney to file informations charging criminal contempt. These informations were later filed in the Supreme Court.

After an unsuccessful attempt to remove the prosecution to the federal courts, see Chestnut v. New York, 370 F.2d 1 (2d Cir. 1966), cert. denied, 386 U.S. 1009, 87 S.Ct. 1355, 18 L.Ed.2d 439 (1967), a hearing was held by Justice Murtagh of the Supreme Court on petitioners' charge that the grand jury selection process as administered in Manhattan resulted in the unconstitutional exclusion of significant portions of the population qualified for jury service.[1] The evidence developed at that hearing disclosed that grand jury service, unlike petit jury service, was entirely voluntary. Citizens were invited rather than summoned to participate. Solicitations to place one's name on the grand jury list, which in 1964 numbered approximately 2,000, were periodically mailed to persons selected at random from the county petit jury list. In 1964, however, no grand jury invitations were sent to potential petit jurors under 35 years of age, or over 65. No more than a third of the addressees responded to these letters, and many of those who did answer affirmatively later withdrew upon learning that, contrary to their assumption, grand jury service was not compulsory. The remaining prospective jurors were interviewed by a Deputy County Clerk, and an investigation was made to uncover any prior criminal record, outstanding judgments or pending

---

1. The hearing was held upon the petitioner's motion that the earlier grant of approval by the Supreme Court to the filing of the contempt informations, be revoked. See N.Y.City Crim.Ct.Act § 42.

litigation.[2] Although former Judiciary Law § 596(3), not repealed until 1967, required that grand jurors must own property worth at least $250, the jury clerks testified that they had ceased to enforce this requirement no later than 1960 on the assumption that anyone with clothes on his back had assets of over $250. It was, however, the practice to exclude welfare recipients from both grand and petit jury service.[3] The names of persons accepted as grand jurors were then added to the grand jury list in the next annual cumulation.

The hearing also disclosed that the grand juror selection system resulted in the underrepresentation, when compared with the general population, of certain ethnic and economic groups. Thus, blacks comprised 1.65% of persons on the grand juror list from which the Second August 1964 Grand Jury was selected, although at the time approximately 24% of the total population of New York County between 21 and 70 years of age was black.[4] Puerto Ricans comprised 0.3% of the jury list, compared with approximately 12% of the population. "Blue collar workers"—a loose classification based on the petitioners' own statistical analysis—comprised 1.2%[5] compared with 47% of the New York County labor force.

## II.

Petitioners' argument that they were denied due process and equal protection by the mere unrepresentative composition of the 1964 grand jury list may be intuitively appealing in its simplicity but we find it logically and legally untenable. Such an unrepresentative

---

2. In greater detail, the selection process entails the following: New York County jurors must be residents of the county, must not have been convicted of a felony or a misdemeanor involving moral turpitude, and must be "intelligent; of sound mind and good character; well informed; [and] able to read and write the English language understandingly." Judiciary Law § 596. Exemptions from jury service are available for women, persons over 70, and such professions as clergymen, physicians, attorneys, policemen and members of the armed forces. Id. § 599. Prospective grand jurors are furnished with a questionnaire which elicits information concerning disqualifications and exemptions from jury service. The form of the questionnaire is prescribed by Rule 17 of the Rules of the Jury System in the City of New York, promulgated by the Appellate Divisions, First and Second Departments pursuant to the authority vested in them by Judiciary Law § 609. The Deputy County Clerk then conducts a personal interview with prospective grand jurors. At that time he reviews the completed questionnaire with them. The Deputy Clerk may thereafter remove the names of prospective jurors who, based on the questionnaire and interview, he concludes are disqualified or have a valid exemption from service, noting briefly the ground for removal. The names of jurors not removed are then forwarded to the local police and their fingerprints sent to the Bureau of Criminal Identification in Albany, for a prior criminal record search. A credit check is also made to determine the existence of outstanding judgments or liens. A juror is disqualified on this ground only if the "flagrant" nature or large number of such outstanding obligations strongly indicates his unreliability. The list of potential grand jurors remaining after the interview and investigation process is then forwarded to the County Jury Board, consisting of the Presiding Justice of the Appellate Division or his designee from the Appellate Division bench; two Supreme Court justices designated by the Appellate Division; and the County Clerk, who acts as the Board's secretary. Judiciary Law § 591. The Board then draws up the annual grand jury list for the following year. During the years 1960–1964 the Board rejected no more than 15 of the approximately 200 new names submitted to it each year for addition to the grand jury list. See generally id. § 609.

3. This practice, like the exclusion of potential jurors who were under 35 years of age, had no statutory basis, and was subsequently terminated.

4. Negroes comprised 14% of the population between 35 and 65 with at least a high school education. All population statistics were based upon the 1960 Census.

5. Occupational statistics were gathered from the 1966 cumulation of the grand jury list.

body, appellants assert, cannot fulfill the democratic ideal of interposing the judgment of neutral laymen representing a cross-section of the local community between the decision of a state's prosecutor and the actual initiation of a criminal proceeding. Few will deny that such an ideal underlies the modern institution of the grand jury. Recent legislative developments in the selection of both federal and New York grand jurors reflect the vitality of the goals that petitioners articulate.[6] Federal courts, in the exercise of their supervisory powers over federal jury selection, have repeatedly struck down systems which arbitrarily exclude significant sectors of the local community. E. g., Thiel v. Southern Pacific Co., 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946) (exclusion of day laborers) (petit jury); Ballard v. United States, 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 (1946) (exclusion of women); United States v. Zirpolo, Nos. 18, 137–42 (3d Cir. Dec. 3, 1970) (underrepresentation of women). Sitting as a federal court reviewing a state system, however, we are not at liberty to impose upon the State of New York our own views on which method we believe to be the ideal for grand jury selection. Our power is limited to determining whether the particular selection method chosen by New York and under review by us violated petitioners' rights to due process and equal protection either because they were called to testify before a constitutionally unrepresentative grand jury or because their subsequent prosecution was initiated by one.[7]

### III.

Addressing ourselves first to the due process claim, we note at the outset that the Supreme Court has repeatedly held that a state may, without violating the Constitution, dispense with a grand jury altogether and initiate criminal prosecutions solely upon the prosecutor's unilateral decision to file an information. Hurtado v. California, 110 U.S. 516, 4 S.Ct. 111, 292, 28 L.Ed. 232 (1884); Kennedy v. Walker, 337 U.S. 901, 69 S.Ct. 1046, 93 L.Ed. 1715 (1949); Beck v. Washington, 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962).[8]

6. With respect to federal jurors, see, e. g., Civil Rights Act of 1957, P.L. 85–315, § 152, 71 Stat. 638 (uniform standard of qualification for federal jurors); Jury Selection and Service Act of 1968, P.L. 90–274, 82 Stat. 53 (random selection of grand and petit jurors from voter registration lists). With respect to New York State jurors, see Act of March 20, 1940, ch. 202, § 1 (eliminating differences in investigations of regular petit jurors and special jurors); Act of July 15, 1965, ch. 778, § 3 (elimination of "blue ribbon" special juries); Act of March 7, 1967, ch. 49 (elimination of $250 property requirement); Act of April 24, 1967 (raising maximum age of jurors from 70 to 75).

7. The district court did not consider all the petitioners' claims on the ground that the grand jury did not indict petitioners, but merely questioned them and upon their refusal to answer acted as a "complaining witness." The court concluded that the representativeness of the grand jury was therefore of little moment.
    Agreeing with the premise that the grand jury assumes its greatest responsibility in deciding whether to indict, we nevertheless hold that petitioners may challenge the composition of the 1964 grand jury list. The grand jury's inquisitorial function offers many opportunities for the use of discretion. Here, for example, the decisions to question, to grant immunity, to phrase questions in yes-or-no fashion, and finally to initiate punishment for contempt, affected substantial interests of the petitioners and were neither inevitable nor ministerial. In particular, we note that the grand jury might have chosen to proceed against the recalcitrant petitioners under New York Judiciary Law §§ 750(A) (5), 751(1), providing a statutory maximum penalty of 30 days' imprisonment, imposed by a Supreme Court justice after an express warning to the witness and after a final opportunity to retract the decision not to testify. Instead, the grand jury ordered the filing of informations charging criminal contempt under former Penal Law § 600(6), punishable by up to a year's imprisonment, id. § 1937.

8. It may be noted that the absence of a constitutional mandate compelling the states to proceed only by grand jury in-

■ We do not, however, rest our decision on this ground. Cf. Beck v. Washington, *supra*, 369 U.S. at 546, 82 S.Ct. 955 (assuming arguendo that a state which resorts to the grand jury process must furnish an impartial grand jury). The grand jury not only may check a prosecutor's decision to proceed against a defendant, but may undertake investigations and make formal accusations on its own initiative. To the extent that a grand jury once utilized not only vetoes prosecutions, but initiates them, a constitutional requirement that the jury be capable of impartiality would not be inconsistent with the principle enunciated above, that the state was not under a constitutional mandate to utilize a grand jury system in the first instance. The petitioners have nonetheless failed to demonstrate that the Second August 1964 Grand Jury was unable to act fairly and impartially. Petitioners speculate that persons who volunteer for grand jury service commonly possess authoritarian personality traits which predispose them to pay undue heed to the prosecutor and to initiate proceedings against persons who may strike them as suspicious or "criminal-type" individuals. But simple willingness to render public service may sufficiently explain a citizen's propensity to volunteer, and petitioners have presented no concrete evidence to support their darker conjecture.

As to the ethnic and economic imbalances described above, petitioners offer even less reason to suspect any resultant partiality. There is no apparent ground for assuming that a grand jury deficient in the various underrepresented groups would be unduly sympathetic to the prosecutor. That Chestnut (alone among the five petitioners) was a Negro, or that all the petitioners were under 35 years of age, is relevant only to the over-simplistic and unsupported assumption that grand jurors predominantly of one race or those over 35, cannot provide a fundamentally fair hearing for persons of another race or generation. See Fay v. New York, 332 U.S. 261, 67 S.Ct. 1613, 91 L.Ed. 2043 (1947) ("we are not ready to assume that * * * differences [in occupation] degenerate into a hostility such that one cannot expect justice at the hands of occupations and groups other than his own"); Note, The Defendants' Challenge to a Racial Criterion in Jury Selection, 74 Yale L.J. 918, 921–22 (1965) (suggesting that because of psychological and other factors, minority-group jurors have been known also to reflect harshness against their own group). To be sure, any partiality that may be associated with the exclusion of a given group will not easily be demonstrated. Yet it is not the office of a federal court to overthrow a state's juror selection method on the basis of mere speculation and hypothesis. The Supreme Court has recently reaffirmed the importance of objective and reliable proof of partiality as a necessary premise of federal judicial interference with state jury selection. Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).[9]

In any event, we are of the view that the appellants' argument on this score is without force. Whatever speculative

---

dictment is some indication that the grand jury's exercise of discretion is not a "fundamental interest," possibly justifying a strict standard of review. See Development in the Law-Equal Protection, 82 Harv.L.Rev. 1065, 1127–1131 (1969).

9. In *Witherspoon*, a trial jury from which potential jurors with scruples against the death penalty had been excluded was challenged as conviction-prone. Although the hypothesis was supported by two empirical studies, the Court refused to accept the petitioner's hypothesis on the

ground that the studies were "too tentative and fragmentary." 391 U.S. at 517, 88 S.Ct. 1770. Petitioners here have presented no factual data of any sort, tentative or otherwise, to support their suspicion of partiality.

A statistically convincing demonstration of bias is, of course, an entirely different matter from the use of statistics as evidence of the state's intentional discrimination against a given group of potential jurors. See Norris v. Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935); p. 617 *infra*.

effect the volunteer system may have had on the grand jury's sense of fairness has little weight when compared with the rational conclusion of New York County officials that volunteer grand jurors would perform their obligations—including the duty to refuse an indictment in appropriate cases—more conscientiously than jurors suffering the considerable inconvenience of jury service pursuant to a compulsory summons. Jurors over 35 may reasonably be expected to draw upon a greater fund of experience because of their previous service on petit juries and their maturity, than those under 35. And welfare recipients, who receive their sustenance from the state, might be viewed as potentially too timid to disagree with the prosecuting attorney, an important spokesman of the state from which they receive substantial benefits.[10]

## IV.

Unlike the due process clause, the equal protection clause of the Fourteenth Amendment unquestionably limits the range of methods New York may adopt for choosing grand jurors. That a state could dispense with grand juries altogether does not, of course, mean that if it adopts that mechanism the state may use it in an arbitrary and discriminatory manner.

But petitioners do not and cannot claim that New York singled them out for special or discriminatory treatment because of their race or any other characteristic, nor do they charge invidious discrimination or arbitrary or irrational methods in the selection process of grand jurors. The Second August 1964 Grand Jury was selected, so far as the record reveals, exactly as was every other grand jury that sat in New York County in 1964. Cf. Fay v. New York, *supra*, 332

U.S. at 285–286, 67 S.Ct. 1613 (special petit juror list for publicized cases); Beck v. Washington, *supra*, 369 U.S. at 549–550, 82 S.Ct. 955 (denial of procedural safeguards before grand jury that were provided in other cases); Collins v. Walker, 329 F.2d 100 (5th Cir.), cert. denied, 379 U.S. 901, 85 S.Ct. 189, 13 L. Ed.2d 175 (1964) (petit jury chosen with respect to defendant's race).

Of course, a defendant is denied equal protection if he is proceeded against by a grand jury from which members of his own race have been arbitrarily or invidiously excluded. Strauder v. West Virginia, 100 U.S. 303, 25 L.Ed. 664 (1880); Neal v. Delaware, 103 U.S. 370, 26 L.Ed. 567 (1881); Norris v. Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L. Ed. 1074 (1935); Pierre v. Louisiana, 306 U.S. 354, 59 S.Ct. 536, 83 L.Ed. 757 (1939); Smith v. Texas, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84 (1940); Hill v. Texas, 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559 (1942); Akins v. Texas, 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692 (1945); Hernandez v. Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954). We hardly need repeat again that our constitutional scheme absolutely bars invidious racial discrimination by the state. Whatever significance statistics indicating underrepresentation of a racial group may have in other circumstances, see Norris v. Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935), petitioners do not urge that the relative paucity of Negroes on the 1964 grand jury list represented purposeful and intentional racial discrimination.[11] They do not deny that the racial imbalance of the list was not the result of "an exclusionary device," Hoyt v. Florida, 368 U.S. 57, 61, 82 S.Ct. 159, 7 L.Ed. 118 (1961), but was due to New York County's system of *voluntary* grand jury serv-

---

10. In any case, the exclusion of welfare recipients had no perceptible impact on the composition of the grand jury list. See p. 617. As for the $250 property qualification, see pp. 617–618 *infra*.

11. Nor can petitioners point to any history of purposeful discrimination in the past which might cast the existing departures from perfect representativeness in a different light. Cf. Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

ice. Compare, e. g., Fay v. New York, *supra* (effect of educational and other qualifications); Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) (effect of nonracially motivated use of peremptory challenge). Nor is it charged that the grand jury selection was infected by *private* racial discrimination. Cf. Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920 (2 Cir. 1968); Kennedy Park Homes Ass'n v. City of Lackawanna, 436 F.2d 108 (2 Cir. 1970), cert. den., 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971).[12] In this respect there is little we can add to the opinion of Chief Judge Fuld for the unanimous New York Court of Appeals. 26 N.Y.2d 481, 311 N.Y.S.2d 853, 260 N.E.2d 501 (1970).

Conceding the absence of purposeful discrimination, petitioners rely on instances when this court and others have required states to justify policies which, regardless of subjective intent, have substantial adverse consequences for racial minorities which have not been suffered by the community at large. E. g., Norwalk CORE v. Norwalk Redevelopment Agency, *supra;* Kennedy Park Homes Ass'n v. City of Lackawanna, *supra.* Cf. Cassell v. Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950) (opinion

of Reed, J.); Hoyt v. Florida, 368 U.S. 57, 82 S.Ct. 159, 7 L.Ed.2d 118 (1961). Assuming the propriety of demanding a similar justification in this case, a point we need not decide, the presumably greater conscientiousness of volunteer jurors as compared to jurors serving under compulsion of a summons—and nothing presented has rebutted this—sufficiently justifies New York's voluntary selection technique.

Similarly, as we have stated, in excluding jurors younger than 35 years of age, New York County presumably chose, as it may, to take advantage of the greater experiences of older persons with petit juries and life's vicissitudes. Petitioners' claim that an "entire generation" of the New York County population was thereby eliminated is hyperbole. Moreover, petitioners concede, as they must, the propriety of some minimum age limit. We need not suggest that any minimum, no matter how high, is permissible, to conclude that nothing in the Constitution dictates that New York must select the traditional third multiple of seven as an age floor on jury service, in preference to the fifth.

■ None of the petitioners is a Puerto Rican, a "blue collar worker,"

---

12. One theory advanced to demonstrate that Chestnut was denied equal protection because of his race is premised on the proposition that the exclusion of a racial group from jury service may impose an official stamp of inferiority on persons of the same race called before the jury as well as on the excluded potential jurors. Cf. Strauder v. West Virginia, 100 U.S. 303, 307–308, 25 L.Ed. 664 (1880); Swain v. Alabama, 380 U.S. 202, 238, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) (Goldberg, J., dissenting). But such underrepresentation of blacks as existed here, which resulted solely from their relatively lower propensity to volunteer, could hardly have conveyed any message of inferiority. Of course in an · appropriate case a litigant may raise the constitutional rights of others than himself, see, e. g., NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). It is not suggested, however, that the excluded potential black jurors were without a

remedy for any wrong the selection system may have caused them, see 18 U.S.C. § 243; Ex parte Virginia, 100 U.S. 339 (1880); 42 U.S.C. § 1983; Carter v. Jury Comm'n, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970), which is the usual justification for permitting the assertion of *jus tertii.* See generally Note, The Defendant's Challenge to a Racial Criterion in Jury Selection, 74 Yale L.J. 919, 932–33; Sedler, Standing To Assert Constitutional Jus Tertii in the Supreme Court, 71 Yale L.J. 599 (1962). In any event, black potential jurors who failed to volunteer for service would have little claim that their exclusion denied them any constitutional right.

Thus the only plausible basis for Chestnut's equal protection claim is the possibility that a grand jury deficient in members of his race would deal with him differently than with prospective defendants or witnesses of other races. But this speculation has not been shown to be any more than that, see p. 615 *supra.*

a welfare recipient or the owner of assets valued at less than $250, and they offer no plausible theory to explain how they were denied equal protection by the exclusion or underrepresentation of these groups. See Fay v. New York, *supra,* 332 U.S. at 287, 67 S.Ct. 1613; United States v. Leonetti, 291 F.Supp. 461, 473 n. 3 (S.D.N.Y.1968), approved in United States v. Bennett, 409 F.2d 888, 892–893 (2d Cir.), cert. denied, 396 U.S. 852, 90 S.Ct. 113, 24 L.Ed. 101 (1969). The underrepresentation of Puerto Ricans and "blue collar workers" is similar, in origin and justification, to the relative paucity of black grand jurors. And, as we have indicated, the exclusion of persons receiving welfare benefits can be supported as a precaution against over-timidity toward the authority supporting them, somewhat analogous to New York's statutory exclusion of government employees, Judiciary Law § 598. In any case we doubt whether this requirement had any perceptible effect upon the composition of the 1964 grand jury list in light of the uncontested fact that 90 percent of welfare recipients in that year were either disabled, over 65 years of age, receiving medical assistance, or mothers and children in homes that lacked a father. Finally, although no sufficient justification for the since repealed $250 property requirement is apparent, see Chestnut v. New York, 370 F.2d 1, 7 n. 13 (2d Cir. 1966), cert. denied, 386 U.S. 1009, 87 S.Ct. 1355, 18 L.Ed.2d 439 (1967); Samuels v. Mackell, 288 F.Supp. 348, 356 (S.D.N.Y.1968) (3-judge court), aff'd on other grounds, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971); United States ex rel. Epton v. Nenna, 318 F.Supp. 899 (S.D.N.Y.1970), appeal pending (2d Cir. No. 35559 September 1970 Term), it ceased to have practical effect in 1960 when the New York County jury officials adopted the eminently reasonable assumption that any potential juror wearing a suit of clothes was worth at least that much. Petitioners claim that a majority of the names on the 1964 grand jury list was added before 1960.

But even if this is so, we cannot believe that such a minimal property threshold had any significant effect upon the makeup of either the 1960 or 1964 list. This imperfection in the selection system, if such it was, could surely be tolerated as *de minimis.*

In upholding the district court's denial of relief, it is unnecessary for us to decide that the Second August 1964 Grand Jury, New York County, was chosen in the manner best calculated to further the democratic values embodied in the grand jury institution. We decide only that it was not chosen in a manner which denied petitioners due process or the equal protection of the laws. On that basis the judgment below is affirmed.