THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v BENJAMIN DE MARTINO, JR., Respondent.

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v PASQUALE AVITABILE, Respondent.

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v SAVERIO SANTORA, Respondent.

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v ROBERT DELLI PAOLI, Respondent.

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v FRANK BATTISTA, Respondent.

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v GIULO MONACO, Respondent.

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v BENJAMIN DE MARTINO, SR., Respondent.

First Department, December 11, 1979

---

APPEARANCES OF COUNSEL

*Michael Shapiro, Thomas A. Duffy, Jr., Edward M. Davidowitz, Thomas P. McCloskey* and *Rae Downes Koshetz* of counsel *(John F. Keenan, Deputy Attorney-General),* for appellant.

*Mark A. Varrichio* for Benjamin De Martino, Jr., and others, respondents.

*Arnold Wallach* of counsel *(Peter J. Peluso,* attorney), for Saverio Santora, respondent.

*Morris Kleinman* for Robert Delli Paoli, respondent.

## OPINION OF THE COURT

LUPIANO, J.

In November, 1975, an Extraordinary Special and Trial Term Grand Jury for Bronx County commenced an investiga-

tion of police corruption. A second Grand Jury undertook the investigation in December, 1976 and completed its proceedings in June, 1977. The investigation focused on the relationship between members of law enforcement agencies, such as the police, and a group of persons (including defendants herein) who patronized a Bronx bar known as Buster's Lounge. It was based upon information obtained from court-ordered electronic surveillance at the bar, visual observations by the police and other investigative sources.

Defendants, subpoenaed, among others, to appear before the Grand Juries, refused, for the most part, to answer any questions, which refusal led to separate contempt indictments accusing each one, in multiple counts, of the crime of criminal contempt in the first degree (Penal Law, § 215.51).

Motions by each of the defendants for an order dismissing the indictments and to suppress alleged illegally obtained evidence, resulted in an order entered on February 27, 1978, dismissing the indictments and suppressing eavesdrop evidence.[1] The lengthy memorandum order of the hearing court regarding these motions discloses a dedicated endeavor to resolve the complex issues posed therein. Essentially, the hearing court concluded that the first warrant authorizing electronic surveillance issued on January 17, 1975 and its renewal issued on February 14, 1975, were based on probable cause; the second warrant authorizing electronic surveillance issued on March 24, 1975 was not based on probable cause, thereby vitiating such warrant and its amendment issued on April 9, 1975; there was no other independent, untainted source for the propounding of questions to these defendants when they appeared as witnesses before the Grand Juries; and the notice requirements delineated in CPL 700.50 (subd 3) were not complied with regarding these defendants. While not specifically ruling on whether the warrant issued May 7, 1975 and its five subsequent renewals were supported by probable cause, the court indicated serious doubt as to their propriety. Similarly, while not specifically ruling that the sealing requirements contained in CPL 700.50 (subd 2) were not complied with in regard to the recording of communications obtained pursuant to these warrants, the hearing court expressed strong doubt that the requirements were observed.

---

1. The People filed notices of appeal with respect to seven of the eight defendants who successfully obtained dismissal of the indictments, no notice of appeal being filed with respect to defendant Anthony Ferro.

For purposes of clarification, we are concerned with three groups of warrants permitting electronic surveillance. On January 17, 1975, the District Attorney obtained a warrant permitting electronic surveillance of Buster's Lounge for purposes of intercepting conversations about illegal gambling. This warrant was extended for 30 days, on February 14, 1975. Although the January warrant, by virtue of the extension, terminated on March 19, 1975, the tape recordings of intercepted conversations obtained during the viable period of the warrant were not sealed until five days later, on March 24, 1975. The excuse for the delay given by the authorities was their belief that a reasonable delay was permissible and they viewed this delay as reasonable.

The second group entails a new warrant obtained by the District Attorney on March 24, 1975 permitting electronic surveillance of Buster's Lounge for purposes of intercepting conversations about illegal gambling and criminal usury. On April 9, 1975, this warrant was amended to also permit interceptions relating to assault, murder and conspiracy to commit same. Although this warrant expired on April 22, 1975, the tape recordings obtained during the period covered by this warrant were not sealed until April 30, 1975—eight days later. The excuse offered for the delay was again belief that a reasonable delay was permissible and that a one-week delay was reasonable.

The third group of warrants had its inception when the Special Prosecutor obtained a warrant permitting electronic surveillance at the lounge for purposes of intercepting conversations relating to illegality in the criminal justice system. The areas authorized to be intercepted concern bribery, criminal usury, assault, murder, illegal gambling and conspiracy to commit those crimes. This warrant was renewed five times—on June 5, July 3, August 1, August 29, and September 26, 1975. The warrant expired on October 25, 1975. Of the 35 reels of tape recordings obtained during the period of this warrant, 18 were sealed on October 27, 1975 (two days later), 16 on October 31, 1975 (six days later) and one on April 26, 1976 (six months later).

█ In *People v Washington* (46 NY2d 116, 122), the Court of Appeals declared that the sealing requirements of CPL 700.50 are to be construed strictly and "that recordings of overheard communications must be presented for judicial sealing immediately upon the expiration of the *specific warrant or exten-*

*sion* covering the period when they were intercepted" (emphasis supplied). As judicial sealing of tapes is required upon the expiration of *each* order, reasonableness of a delay in so sealing is "measured from the expiration of the specific order or extension under which it was seized" *(People v Washington, supra,* at p 123). Adequate explanation for the delay may be given.

On this record it is clear that no adequate excuse for the delay in sealing has been demonstrated, albeit we credit the police with good faith in their assertion that *at the time* it was their opinion that delays of a few days in sealing the recordings of overheard communications after expiration of the original warrant as extended by subsequent orders was permissible. Thus, the tapes must be suppressed and are not admissible and the testimonial use or disclosure of the contents of any communication or evidence derived therefrom is proscribed (CPL 700.65, subd 3).[2]

The People argue that despite the fact that the tapes themselves must be suppressed, the information obtained from an intercept under a lawful warrant permitting electronic surveillance may serve a limited purpose, namely as a source for questions to be propounded before the Grand Jury. As noted in *People v Canarrozzo* (64 AD2d 1018): "The prohibition against the use of tapes which have not been sealed pursuant to CPL 700.50 (subd 2) applies to their use or the disclosure of their contents *while giving testimony under oath* in any criminal proceeding in any court or in any grand jury proceeding' (CPL 700.65, subd 3). The prohibition in CPL 700.65 (subd 3) does not extend to disclosure of the contents of unsealed tapes to other law enforcement personnel for purposes of assisting their investigation or * * * for establishing probable cause for the issuance of additional warrants (CPL 700.65, subds 1, 2; *United States v Fury,* 554 F2d 522, 531-532, cert den *sub nom. Quinn v United States,* 433 US 910; *People v Iucci,* 61 AD2d 1, 10-11)" (emphasis supplied).[3] Assuming the authorization for the electronic surveillance to be proper, the

---

2. While a minimal delay of one or two days in sealing might under appropriate circumstances be permissible, the record herein demonstrates a rather cavalier attitude toward the sealing requirement and the People have not carried their burden in attempting to explain their delay.

3. It is also noted that even though eavesdropping evidence is inadmissible, it may be used to impeach a witness with his prior inconsistent statements (see *Walder v United States,* 347 US 62; *Harris v New York,* 401 US 222).

distinction of sealing being a *postintercept* requirement obtains relevance in determining whether derivative, as distinguished from testimonial, use of tapes which had not been timely sealed, may be made (see *United States v Fury,* 554 F2d 522, 532, cert den *sub nom. Quinn v United States,* 433 US 910). Pertinently, in *People v McGrath* (46 NY2d 12, 27), the Court of Appeals noted that "Federal courts have held that in a proceeding before the Grand Jury a witness is entitled to a suppression hearing only where there is an absence of a court order permitting the eavesdropping or the Government concedes the illegality of the surveillance or where there has been a prior judicial adjudication of illegality." Thus, where the wiretap was illegal, a witness appearing before the Grand Jury may refuse to answer, but may not choose to testify in an evasive, equivocal and patently false manner with the consequence that as to the former—contempt by refusal to answer, the illegality of the wiretap constitutes a defense to prosecution for criminal contempt—as to the latter—contempt by evasive answer, it does not because a constitutionally guaranteed right may not be cavalierly converted into a license to commit contempt—by evasive answer *(People v McGrath, supra,* at p 29).

Although the Grand Jury is a part of the court that impaneled it, it does not try defendants, but is solely an inquisitorial body—its purpose being to investigate offenses by hearing and examining evidence and to determine whether to permit the prosecution of offenses (CPL 190.05). In a departure from common law, the rule in New York is that only competent and relevant evidence may be introduced at a Grand Jury proceeding (CPL 190.30). Relevant to this, a distinction should be made between evidence which is inadmissible because it is incompetent and evidence which is competent on its face but is rendered inadmissible only by extrinsic, subsequent proof (see *People v Oakley,* 28 NY2d 309).

Of further relevance, the minimization requirement of the warrant is to be fulfilled in its execution, that is, by the manner in which the authorities conduct the eavesdropping operation and, of necessity, this usually entails partial or complete monitoring of the intercepted conversation. Thus, the intercepted conversation may be subjected not only to being recorded, but also to being overheard by the ear of the monitoring agent. Apart from the interpreted conversations being physically duplicated on a tape recording machine, i.e.,

being "overheard" and memoralized by a tape recording device, it may also be overheard by another person. The monitoring agent where he has overheard the intercepted conversation may be a source apart from the tape recording itself, possessing information as to the contents of the intercepted conversation. However, the broad proscription of CPL 700.65 (subd 4) is keyed to "the contents of any communication" and is not relegated merely to the physical tapes themselves.

On this record the scope of efforts to minimize, i.e., to execute the warrant in a manner designed to reasonably avoid the interception of nonrelevant (unrelated to the crimes covered by the warrant) and privileged communications is set forth in the testimony of the attorney assigned to oversee the electronic surveillance at Buster's Lounge during 1975. He testified as to regular and numerous conversations between the officers in charge of the wiretap at "the plant level" to the effect that they were not to turn on the equipment until notified by an observer that a subject was in the lounge and then to monitor a conversation long enough to see if it is pertinent. He related that "[t]here came a time when we thought the investigation was really heating up * * * During that period of time I think we were listening to it almost all of the time that the principal subjects were in the premises". Assuming the warrants to have properly issued, the failure to timely seal the tape recordings would not, of itself, serve to vitiate the monitoring of the intercepted conversations and the monitoring agent himself might also serve as a basis for the questions propounded to a witness before a Grand Jury (see CPL 700.65, subds 1, 2). Parenthetically, we note that the record herein does not contain sufficient grounds for the hearing court's conclusion that the People's minimization instructions were not obeyed.

In light of the court order, facially valid, permitting the eavesdropping herein, the absence of any concession by the authorities as to illegality and the absence of any prior judicial adjudication of illegality at the time of the Grand Jury proceedings, there was no impediment to the admissibility of wiretap evidence before the Grand Jury and the People's contention that it was not proscribed from asking questions based on the eavesdropping is meritorious (see *People v McGrath,* 46 NY2d 12, 27, *supra).* However, the wiretapping, while it may be valid initially as proceeding under proper warrants, was subjected to the impediment of failure to timely

seal the recordings of communications. The contempt power may not be utilized to compel testimony by a Grand Jury witness based on questions which result solely from information obtained as the result of improper wiretapping and by remaining *silent* in the face of such questioning, the witness by his conduct does not serve to attenuate the taint and thus has a defense to the endeavor to punish him for that *silence (People v Einhorn,* 35 NY2d 948). The actions of defendants herein forming the basis of the indictments are grounded in contempt by silence rather than contempt by evasive answers (cf. *People v McGrath, supra).* The questioning of defendants before the Grand Jury insofar as it emanated from wiretaps of conversations, the contents of which have been suppressed for failure to timely seal, loses potency as a predicate for punishing defendants for contempt by refusing to answer because such questioning constitutes evidence derived from the use or disclosure of the contents of the intercepted conversations. However, if the questioning of defendants before the Grand Jury has a source or basis independent of the wiretaps, then a predicate untainted by the failure to timely seal recordings of electronic eavesdropping, remains for purposes of admissible evidence at the trial of the contempt indictments.

We need not, in view of the aforesaid, confront the issue of whether the warrants, their amendments and extensions, were properly authorized.

The People properly assert that questions derived from sources independent of the electronic eavesdropping should stand as they are not tainted by the failure to seal and the suppression of the tape recordings. Insofar as an alleged independent source may have been necessarily derived from the electronic surveillance, it may not serve as a basis for such questioning before the Grand Jury. The prosecution bears an affirmative duty under the circumstances herein to demonstrate that the questions it used before the Grand Jury in interrogating the defendants are derived from a legitimate source wholly independent of the electronic surveillance, or that the connection between the primary taint and the evidence in question is so "attenuated" as to dissipate the taint. (See *People v Mendez,* 28 NY2d 94; see, also, *Silverthorne Lbr. Co. v United States,* 251 US 385; *Nardone v United States,* 308 US 338, 341; *Wong Sun v United States,* 371 US 471, 487-488.) As noted in *People v Mendez (supra,* at p 98): " 'We need not hold that all evidence is "fruit of the poisonous tree" *simply*

*because it would not have come to light but for the illegal actions of the police.* Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." ' " In our case we are not presented with contempt by evasive answer, which conduct serves to dissipate or attenuate the primary taint, but with contempt by refusal to answer (see *People v McGrath, supra).* Mr. Justice BRENNAN in delivering the opinion of the court in *Gelbard v United States* (408 US 41, 51-52) declared: "The purposes of § 2515 and Title III as a whole would be subverted were the plain command of § 2515 ignored when the victim of an illegal interception is called as a witness before a grand jury and asked questions based upon that interception * * * Consequently, to order a grand jury witness, on pain of imprisonment, to disclose evidence that § 2515 bars in unequivocal terms is both to thwart the congressional objective of protecting individual privacy by excluding such evidence and to entangle the courts in the illegal acts of Government agents."

The People do not argue the appropriateness of application of inevitable discovery concepts to the circumstances herein *(People v Reisman,* 29 NY2d 278; *People v Fitzpatrick,* 32 NY2d 499), relying solely on the claim of an independent, untainted source for the questions propounded before the Grand Jury. In this regard, as already indicated, they have the burden of proof, not limited to mere negation of taint, but of affirmatively demonstrating that the evidence they propose to use is derived from a legitimate source, wholly independent of the primary taint (see *Kastigar v United States,* 406 US 441, 460). On this record it is clear—and we so find and the People in some measure concede—that the following counts in the indictments emanate from, in whole or in part, the electronic surveillance and are not shielded from the exclusionary rule by virtue of attenuation or some other exception to that rule: as to defendant Benjamin De Martino, Jr., Counts 4, 5 and 6, the fifth of the seven interrogatories of Count 2, and the first, third and fifth interrogatories of Count 3; as to defendant Pasquale Avitabile, Counts 3 and 4 and the latter two of the three interrogatories of Count 2; as to defendant Saverio Santora, Counts 3, 4, 5 and the third interrogatory of the five interrogatories of Count 2.

In concluding this aspect of our analysis, we note that it seems reasonably clear that it was probable that the lawful surveillance of the defendants at Buster's Lounge, apart from the electronic surveillance, having its inception in probable cause regarding illegal gambling, would have led the authorities in any event to an awareness of the identities of the persons who frequented this public establishment and were possibly, or even probably, known to the subjects of the investigation (see *People v Mendez,* 28 NY2d 94, 101, *supra).* Also, of some relevance is the evaluation of the standards for application of the exclusionary rule to live-witness testimony delineated in *United States v Ceccolini* (435 US 268) which indicates a more restrictive application in the case of witnesses than in the case of inanimate evidentiary objects illegally seized.

We express no view on the issue raised by defendants to the effect that the contempt prosecutions may not lie because the proceeding in which the contents occurred were designed for no other valid purpose than to produce the contempt. In support of this contention, defendants rely, in part, on an interoffice memorandum of the Organized Crime Section of the New York Police Department wherein it is stated: "The strategy of this investigation is to use the 'Grand Jury' approach, that is to obtain 'hard-fast' information on persons prominent in the investigation, serve them with Grand Jury subpoenas, grant them limited immunity to particular facts and attempt to make contempt and perjury cases against them." As aptly observed in *Matter of Nigrone v Murtagh* (36 NY2d 421, 426): "Such an issue, apart from anything else, would of necessity involve a question of fact not disposable on papers submitted on motion * * * In holding as it does the court is fully aware of the disadvantages to prosecution and defendant in not resolving intermediate issues summarily, but criminal actions are particularly designed to dispose of all issues in the criminal action, and with very few exceptions, to discourage appeals except from a final judgment [citations]."

■ With respect to the contention that the counts of criminal contempt are multiplicious, it appears that they are related to the same subject matter, to wit, an investigation into the crimes of bribery, bribe receiving and official misconduct to determine the relationship of defendants to members of the law enforcement establishment and whether defendants had planned to pay or, in fact, paid such members to protect

and promote conduct in violation of law. The record is devoid of any response by the People to the assertion that despite being notified of defendants' refusal to answer, the Special Prosecutor persisted in asking questions, different though they were from one another, all related to that one subject. In light of *People v Chestnut* (26 NY2d 481), we conclude that the defendants respectively engaged in a continuing act which may serve as the predicate for a single count of contempt, albeit that count of contempt comprises refusal to answer a number of interrogatories (see, also, *People v Riela,* 7 NY2d 571).

■■ Accordingly, the order of the Supreme Court, Bronx County (JONES, J.), entered February 27, 1978, dismissing indictments in which each defendant was charged in multiple counts, with criminal contempt in the first degree, should be modified, on the law, to the extent of dismissing the following as a basis for charging the defendants with contempt: as to defendant De Martino, Jr., the interrogatories contained in Counts 4, 5 and 6, the fifth of the seven interrogatories of Count 2, and the first, third and fifth interrogatories of Count 3; as to defendant Avitabile, the interrogatories contained in Counts 3 and 4 and the latter two of the three interrogatories of Count 2; as to defendant Santora, the interrogatories contained in Counts 3, 4 and 5 and the third interrogatory of the five interrogatories of Count 2. The remaining interrogatories of the various counts of contempt in respect of each defendant (except as to defendant Anthony Ferro) are consolidated so as to charge one count of contempt as to each defendant, and the indictments (except as to defendant Anthony Ferro) are reinstated in accordance with the aforesaid, and as so modified, the order should be affirmed.

SULLIVAN, J. P., SILVERMAN and YESAWICH, JJ., concur.

Order, Supreme Court, Bronx County, entered on February 27, 1978, modified, on the law, to the extent of dismissing the following as a basis for charging the defendants with contempt: as to defendant De Martino, Jr., the interrogatories contained in Counts 4, 5 and 6, the fifth of the seven interrogatories of Count 2, and the first, third and fifth interrogatories of Count 3; as to defendant Avitabile, the interrogatories contained in Counts 3 and 4 and the latter two of the three interrogatories of Count 2; as to defendant Santora, the interrogatories contained in Counts 3, 4 and 5 and the third

interrogatory of the five interrogatories of Count 2. The remaining interrogatories of the various counts of contempt in respect of each defendant (except as to defendant Anthony Ferro) are consolidated so as to charge one count of contempt as to each defendant, and the indictments (except as to defendant Anthony Ferro) are reinstated in accordance with the aforesaid, and as so modified, the order is affirmed.