OPINION OF THE COURT
Jasen, J.
Today, this court finds itself engaged in the not altogether foreign task of attempting to demarcate the seemingly inexhaustible reach of the exclusionary rule. More specifically, in the first of two cases, People v McGrath, the question presented is whether in a criminal contempt proceeding the Fourth Amendment requires suppression of a defendant’s testimony before the Grand Jury as the fruit of an illegal wiretap. In the companion case, Matter of Mancini v Codd, the issue posed is whether, in a civil disciplinary proceeding in which a policeman is charged with perjury, the Fourth Amendment requires the suppression of his testimony before the Grand Jury, as well as the testimony of witnesses at the subsequent disciplinary hearing, as fruit of an illegal wiretap.
I
In determining whether, in a particular case, illegally obtained evidence and the fruits thereof must be suppressed, we are guided by the realization that the exclusionary rule functions as a judicially created tool for the effectuation of constitutionally guaranteed rights. (Stone v Powell, 428 US 465, *21 482; United States v Calandra, 414 US 338, 348; Matter of Finn's Liq. Shop v State Liq. Auth., 24 NY2d 647, 653, cert den 396 US 840.) Formulated as a pragmatic response to law enforcement procedures violative of individual liberties, the exclusionary rule has never enjoyed the stature of an end in itself, but, rather, has served solely as a means to an end: a remedial device operating essentially upon a principle of deterrence. At no time has the exclusionary rule been construed as a personal remedial right of a party aggrieved by conduct violative of a constitutional right. (United States v Calandra, 414 US, at p 347, supra.) Thus, we view the applicability of the exclusionary rule to the cases at bar as dependent upon a balancing of its probable deterrent effect against its detrimental impact upon the truth-finding process.
While the applicability of the exclusionary rule to administrative as well as criminal proceedings in New York can no longer be disputed (see Matter of Finn's Liq. Shop v State Liq. Auth., 24 NY2d 647, supra; Matter of McPherson v New York City Housing Auth., 47 AD2d 828; see, also, CPLR 4506), we note that the Supreme Court has acknowledged the inapplicability of the exclusionary rule to preclude the "use of illegally seized evidence in all proceedings or against all persons.” (United States v Calandra, 414 US, at p 348, supra.) Employing a balancing approach, the court has declined to apply the exclusionary rule in those areas where the ultimate effectuation of its remedial objectives is only tenuously demonstrable. For example, although a defendant’s incriminating statements elicited by the police in violation of Miranda v Arizona (384 US 436) cannot be used by the prosecution as evidence-in-chief, they may be used to impeach his credibility if he decides to take the stand and testify. Once a defendant voluntarily takes the stand, he has an obligation to testify truthfully. As Chief Justice Burger cogently stated: "The shield provided by Miranda cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances.” (Harris v New York, 401 US 222, 226.) In such a case, any deterrent effect which application of the exclusionary rule may work upon police conduct is furnished by the exclusion of the defendant’s incriminating statement from the prosecution’s evidence-in-chief. To hypothesize that exclusion of these statements for impeachment purposes provides an additional meaningful deterrent to proscribed police conduct assumes too *22 much. (Id., at p 225; Oregon v Hass, 420 US 714; Walder v United States, 347 US 62; People v Rothschild, 35 NY2d 355; see, also, Stone v Powell, 428 US 465, supra [deterrent effect of exclusionary rule too insubstantial to permit consideration of search-and-seizure claim on petition for habeas corpus review of State conviction]; United States v Calandra, 414 US 338, supra [deterrent effect of exclusionary rule too insubstantial to apply to proceedings before the Grand Jury]; Alderman v United States, 394 US 165 [deterrent effect of exclusionary rule too insubstantial to afford standing to challenge search- and-seizure beyond those whose rights were violated by the search-and-seizure].)
In a similar vein, the court has recently refused to apply the exclusionary rule to preclude the use of evidence obtained illegally by a State Police officer in a Federal civil tax proceeding (United States v Janis, 428 US 433), reasoning that the exclusion of such evidence in both State and Federal criminal proceedings furnished a sufficient deterrent effect, rendering insubstantial any additional deterrent effect flowing from exclusion of the evidence in the Federal civil proceeding. (Id., at p 448.) With this background in mind, we proceed to an analysis of the merits of the instant appeals.
II
In People v McGrath, the defendant was called to testify before the New York County Grand Jury, which included within the scope of its investigation an alleged conspiracy between individuals by the names of Hugh Mulligan and Thomas Callahan to murder a witness in a Federal robbery prosecution against Callahan. After having been granted transactional immunity, the defendant inquired whether any questions to be asked of him would be based upon information obtained through electronic surveillance. When informed by the Assistant District Attorney that some of the questions asked might be based upon such information, the defendant declined to answer any questions until the legality of the electronic surveillance was determined by a Judge.
Upon appearing before the Presiding Justice, the defendant maintained that he was entitled to a full suppression hearing to determine the legality of the surveillance. While the court refused to conduct a full hearing, it did examine the eavesdropping orders, concluding that they were facially valid and *23 directing the defendant to return to the Grand Jury and answer all proper questions.
Although the defendant complied with this order, he answered all questions "under protest”. On the basis of his testimony before the Grand Jury, the defendant was indicted and charged with two counts of criminal contempt in the first degree. (Penal Law, § 215.51.) The indictment alleged that the defendant’s answers were evasive, equivocal and patently false, such that they amounted to no answers at all.
Prior to trial, the second count of the indictment was dismissed for legal insufficiency in that the defendant’s answers supporting that count were not considered sufficiently evasive and equivocal to constitute criminal contempt. As to the first count, although the court, upon the defendant’s motion to suppress, held the eavesdropping orders legally defective,* it nonetheless refused to suppress the defendant’s testimony given in response to questions based upon information derived through the wiretap, viewing the defendant’s testimony as an independent act calculated to obstruct the investigation of the murder conspiracy conducted by the Grand Jury, rather than as fruit of the illegal surveillance.
At the conclusion of the defendant’s trial, the jury returned a verdict finding him guilty of criminal contempt. The Appellate Division reversed and dismissed the indictment, however, concluding that the defendant’s Grand Jury testimony constituted fruit of the illegal wiretap and, therefore, should have been suppressed. The People now appeal to this court. There should be a reversal.
Ill
In Matter of Mancini v Codd, the police, during the course of a narcotics investigation, placed a wiretap upon the telephone of Sylvestro Nanfro, respondent Ugo Mancini’s cousin, through which they overheard conversations participated in *24 by respondent indicating that the latter was involved in loansharking and bookmaking operations. Based upon the information obtained through the wiretap, the District Attorney subpoenaed respondent and a fellow policeman, Joseph Cembrale, to testify before the Bronx County Grand Jury.
Upon appearing before the Grand Jury, respondent was asked whether he knew Cembrale, to which he responded by inquiring whether he, Mancini, was the target of the police investigation. The District Attorney informed respondent that his role before the Grand Jury was one of a witness, rather than a target of the investigation. After further advising respondent of the availability of the privilege against self incrimination, respondent invoked that privilege and requested immunity — a request which the Grand Jury granted. Prior to resuming his questioning of respondent, the District Attorney warned respondent that, notwithstanding a grant of transactional immunity, a witness before the Grand Jury remained subject to prosecution for perjury and contempt. At this point, after indicating that he had no further questions, respondent proceeded to testify.
In April of 1971, the Grand Jury returned a nine-count indictment charging respondent and Cembrale with having committed perjury before the Grand Jury. Both officers were immediately suspended from the New York City Police Department. Thereafter, on June 17, 1971, formal departmental charges were filed against respondent, nine specifications of which mirrored the perjury indictment, the remaining three of which charged respondent with associating with known loan sharks and extortionists.
While Cembrale pleaded guilty to a misdemeanor in satisfaction of the indictment and was placed on probation, respondent pleaded not guilty and moved to suppress the recorded telephone conversations implicating him in loansharking and bookmaking operations. On November 19, 1974, the Supreme Court, Bronx County, granted respondent’s motion ordering "the suppression of the factual information which came to the knowledge of the People by reason of the eavesdropping”. The basis for the order of suppression was the failure of the wiretap warrant to indicate Sylvestro Nanfro’s name as the person whose conversations were to be intercepted and the failure of the District Attorney to make timely application to amend the warrant to include additional crimes overheard. *25 Lacking this critical evidentiary material, the District Attorney subsequently discontinued the case against respondent.
In April of 1975, appellant Police Commissioner commenced the departmental disciplinary proceeding against respondent, at which point respondent moved to suppress his Grand Jury testimony as the fruit of an illegal wiretap. However, the trial commissioner reserved decision. At the hearing, the evidence introduced by the department consisted of respondent’s Grand Jury testimony and the testimony of three witnesses, Sylvestro Nanfro, Joseph Cembrale and Benedetto Carbonetto, all of which contradicted respondent’s testimony before the Grand Jury.
At the conclusion of the hearing, respondent renewed his motion to suppress his Grand Jury testimony, requesting additionally the exclusion of the remainder of the department’s evidence, including the testimony of the three witnesses, as fruit of an illegal wiretap. Although the trial commissioner granted respondent’s motion as to the three specifications charging respondent with associating with known loan sharks and extortionists, and dismissed those specifications, he ruled admissible, as to the remaining nine perjury specifications, respondent’s Grand Jury testimony and that of the three witnesses.
On the merits, the trial commissioner found respondent guilty of seven of the nine specifications and recommended that respondent be dismissed from the police department. Appellant commissioner adopted the trial commissioner’s recommendation and formally dismissed respondent from the department. Respondent then commenced the instant article 78 proceeding to annul appellant’s determination on the ground that all evidence introduced by the department at the disciplinary hearing constituted fruit of an illegal wiretap and, therefore, should have been excluded. Upon transfer from Special Term, the Appellate Division reversed, holding the challenged evidence inadmissible, and remanded for a new hearing, at which the introduction of evidence would be limited to that derived independently of the eavesdrop. The commissioner now appeals to this court. There should be a reversal.
IV
In both cases, McGrath and Mancini, respondents on these *26 appeals, maintain initially that the use of information obtained through the illegal wiretaps to elicit testimony before the Grand Jury was absolutely precluded by CPLR 4506 (subd [1]), which provides: "The contents of any overheard or recorded communication, conversation or discussion, or evidence derived therefrom, which has been obtained by conduct constituting the crime of eavesdropping, as defined by section 250.05 of the penal law, may not be received in evidence in any trial, hearing or proceeding before any court or grand jury, or before any legislative committee, department, officer, agency, regulatory body, or other authority of the state, or a political subdivision thereof; provided, however, that such communication, conversation, discussion or evidence, shall be admissible in any civil or criminal trial, hearing or proceeding against a person who has, or is alleged to have, committed such crime of eavesdropping.” We do not agree. The New York eavesdropping statute was intended to conform "State standards for court authorized eavesdropping warrants with federal standards.” (Governor’s Memorandum, L 1969, ch 1147, NY Legis Ann, 1969, p 586; People v Mulligan, 40 AD2d 165, 166.)
The pertinent Federal statute, title III of the Omnibus Crime Control and Safe Streets Act of 1968 (US Code, tit 18, §2510 et seq.), contains the identical exclusionary language (US Code, tit 18, § 2515). Nonetheless, the Federal courts have read section 2515 in conjunction with section 2518 (subd [10], par [a]), which defines the class of persons entitled to make a motion to suppress such evidence. Although section 2515, like CPLR 4506 (subd 1), makes reference to the Grand Jury, section 2518 (subd [10], par [a]), like its New York analogue, CPLR 4506 (subd 2), does not include a person called before the Grand Jury within the definition of an aggrieved person entitled to make a motion to suppress evidence obtained through illegal electronic surveillance. In fact, the Senate Report on this legislation states: "This provision [§ 2518, subd (10), par (a)] must be read in connection with section 2515 and 2517, discussed above, which it limits. It provides the remedy for the right created by section 2515. Because no person is a party as such to a grand jury proceeding, the provision does not envision the making of a motion to suppress in the context of such a proceeding itself. Normally, there is no limitation on the character of evidence that may be presented to a grand jury, which is enforcible by an individual. [United States v Blue, 384 US 251.] There is no intent to change this *27 general rule. It is the intent of the provision only that when a motion to suppress is granted in another context, its scope may include use in a future grand jury proceeding.” (Senate Report No. 1097, 90th Cong, 2d Sess, US Code Cong & Admin News, 1968, pp 2112, 2195.) Based upon this legislative history, Federal courts have held that in a proceeding before the Grand Jury a witness is entitled to a suppression hearing only where there is an absence of a court order permitting the eavesdropping or the Government concedes the illegality of the surveillance or where there has been a prior judicial adjudication of illegality. (Matter of Persico, 491 F2d 1156, 1162, cert den 419 US 924; United States v Morales, 566 F2d 402, 407, supra; Matter of Millow, 529 F2d 770, 773; Matter of Grand Jury Proceedings [United States v Worobyzt], 522 F2d 196, 198, cert den 425 US 911; Droback v United States, 509 F2d 625, cert den 421 US 964.) Thus, inasmuch as New York’s eavesdropping statute was intended to conform State standards with Federal standards (see People v Mulligan, 40 AD2d 165, supra), we believe that the information obtained through the wiretaps in McGrath and Mancini, as well as the fruits of that surveillance — i.e., the testimony of respondents — was admissible before the respective Grand Juries.
Having determined that this evidence was admissible at these proceedings, we believe that its admission in the subsequent criminal contempt proceeding in McGrath and the civil disciplinary proceeding in Mancini, rests upon the application of attenuation principles. The Federal eavesdropping statute (US Code, tit 18, § 2510 et seq.), upon which CPLR 4506 is modeled, was neither intended to expand the existing role of suppression in search-and-seizure law, nor to modify the principle of attenuation. (Code Cong & Admin News, 1968, pp 2112, 2185; United States v Giordano, 416 US 505, 528, n 17.) Consequently, respondents’ argument that CPLR 4506 absolutely precludes the use of this evidence irrespective of attenuation must fail.
The question whether an intervening event may be of sufficient magnitude to break or attenuate the causal relationship between unlawful police conduct and the acquisition of evidentiary proof so as to dissipate the taint (see Wong Sun v United States, 371 US 471; Nardone v United States, 308 US 338; People v Mendez, 28 NY2d 94, cert den 404 US 911) is not resolvable by precise mathematical calculation. (United States v Ceccolini, 435 US 268, 273-274; see, e.g., Brown v *28 Illinois, 422 US 590; People v Townes, 41 NY2d 97; People v Munger, 37 AD2d 950, app dsmd 33 NY2d 576.) The factors to be considered in making such a determination have recently been explored by the Supreme Court in a case not unlike Mancini.
In United States v Ceccolini (supra), a police officer, on assignment as a school crossing guard, entered the defendant’s flower shop on his break to converse with a friend, an employee of the shop. While engaged in conversation, the officer noticed an envelope from which money protruded lying on the cash register drawer. Upon examining the envelope, the officer discovered that it contained policy slips as well as money. Without informing the employee of the contents of the envelope, the police officer inquired as to its owner, to which inquiry the employee responded that it belonged to the defendant, who had instructed her to give it to a third party. Ultimately, the defendant was indicted for perjury before a Federal Grand Jury. However, the trial court held the testimony of the employee of the flower shop, who had subsequently been contacted by, and had provided information to, the Federal Bureau of Investigation concerning the incident, inadmissible as fruit of the illegal search of the flower shop conducted by the police officer during his conversation with the employee.
In reversing and holding this testimony admissible, the Supreme Court, although rejecting a per se rule that testimony of a live witness is not subject to the exclusionary rule irrespective of its proximity to unlawful police conduct, concluded that the causal connection between the illegal search and the witness’ testimony was sufficiently attenuated to permit introduction of the challenged testimony. (435 US, at pp 279-280.) The factors considered important by the court in reaching this conclusion were essentially threefold: the degree of free will exercised by the witness in testifying; the "length of the road” between the illegal search and the authority’s initial contact with the witness and between that contact and the witness’ trial testimony; and, a consideration of the purpose of the exclusionary rule as weighed against the impact upon the truth-finding process resulting from its application.
In both McGrath and Mancini, we believe that respondents’ actions in testifying as they did before the Grand Jury after having been granted immunity constituted acts sufficiently independent of the illegal wiretap so as to dissi *29 pate any taint flowing from the proscribed police conduct. (United States v Raftery, 534 F2d 854, 857, cert den 429 US 862; United States v Turk, 526 F2d 654, 667, cert den 429 US 823.) The protections afforded by constitutionally guaranteed rights may not be cavalierly converted into a license to commit perjury or contempt by evasive answer. People v Ianniello, 21 NY2d 418, 423, cert den 393 US 827; cf. United States v Wong, 431 US 174; United States v Mandujano, 425 US 564; United States v Knox, 396 US 77; United States v Bryson, 396 US 64.) Having been granted immunity, respondents had no cause to testify as they did before the Grand Jury. Although respondents’ appearances before the Grand Jury must be viewed as causally related to the illegal wiretaps, their voluntary and deliberate acts in choosing to testify falsely and evasively before that body furnished vitally independent links in the chains of causation.
 In so holding, we reject respondent McGrath’s contention that the illegality of the wiretap in his case constitutes a defense to a criminal contempt proceeding. True, a witness before the Grand Jury may refuse to answer questions derived from information obtained through an illegal wiretap. Where a witness refuses to answer any questions before the Grand Jury upon this ground, the contempt power may not "be used to compel such testimony or punish the witness for his silence.” People v Einhorn, 35 NY2d 948, 949, supra.) If sustained, the illegality of the wiretap constitutes a defense to prosecution for criminal contempt. (Id.) This defense is available to a witness, however, only where he remains silent refusing to testify before the Grand Jury. It is not available to a witness who although choosing to testify does so in an evasive, equivocal or patently false manner. In this regard, contempt by evasive answer, as distinguished from a flat refusal to answer, is conceptually indistinguishable from perjury; no witness has a license to testify evasively or falsely before the Grand Jury. People v Ianniello, 21 NY2d 418, 423, supra.) In such a case, a witness may not seek to avoid prosecution for criminal contempt by raising the defense of an illegal wiretap. By his own voluntary and independent action before the Grand Jury, an evasively contumacious witness dissipates any taint flowing from proscribed police conduct.
There remains, however, a vital distinction between contempt by evasive answer and perjury for the purposes of attenuation. While both evasively contumacious and perjured *30 testimony before the Grand Jury dissipate any taint flowing from an illegal wiretap for the purpose of permitting the introduction of such testimony in subsequent criminal or civil proceedings, there remains in the case of perjury the necessity for the introduction of testimony by other witnesses proving the perjured nature of, as in the case of respondent Mancini, a witness’ Grand Jury testimony. With respect to whether there exists sufficient attenuation of the illegal wiretap to permit the introduction in Mancini of the live testimony of witnesses Nanfro, Cembrale and Carbonetto at respondent’s disciplinary proceeding, we direct our attention once again to the attenuation factors considered by the Supreme Court in United States v Ceccolini (435 US 268, supra).
In regard to the degree of free will exercised by the live witnesses in testifying, we recognize that the analogy in Mancini to Ceccolini is less than compelling. In Ceccolini, the court commented that the employee’s testimony was neither coerced nor induced by official authority, demonstrating a greater likelihood that he or she might have been discovered by legal means. (Id., at p 276; see, also, People v Mendez, 28 NY2d 94, 101, supra.) In contrast, the degree of free will exercised, at least by witnesses Nanfro and Cembrale, who were indicted for loansharking and perjury, respectively, and who both pleaded guilty to those charges, is far less evident. In fact, Nanfro was on parole at the time he testified and Cembrale, who. was placed on probation, was reinstated to the police department on condition that he testify against respondent. Certainly, at least with respect to these witnesses, a claim that they testified as a result of inducement by the authorities cannot be disregarded. In fact, in assessing the likelihood of their discovery by the authorities through legal means apart from the illegal wiretap, one must characterize that contingency as remote.
Turning to the second factor, the "length of the road” between the illegal wiretap and the authority’s initial contact with the witness and between that contact and the witness’ live testimony, we find that the scale tips in favor of admissibility. As in Ceccolini, substantial time periods elapsed between these critical dates: the illegal wiretap was placed upon Nanfro’s telephone in August of 1970; respondent was not indicted for perjury until April of 1971 (the earliest date upon which the authorities could have contacted these witnesses to testify as to respondent’s perjury); and, finally, the witnesses *31 did not testify against respondent at the disciplinary hearing until April of 1975. Under these facts, the road emanating from the wiretap, although perhaps not winding, was certainly a lengthy one.
 The last, and in our view perhaps most important factor to be addressed, is whether, accepting the obvious detrimental impact upon the truth-finding process which the exclusionary rule often produces, its accompanying deterrent effect is sufficiently probable to justify its application. In this regard, we have noted earlier the increasing emphasis on the deterrent effect of the exclusionary rule as the single-most, if not sole, justification for its application. (See Stone v Powell, 428 US 465, supra; United States v Janis, 428 US 433, supra; United States v Calandra, 414 US 338, supra; Harris v New York, 401 US 222, supra) Concededly, this case does not fall within the holding of United States v Janis (supra), in that, although, like Janis, a civil proceeding is involved, the unlawful police conduct challenged in this case was committed not by officers of a different sovereign, but by officers of the same sovereign in which the civil proceeding was commenced. Nonetheless, we view the Supreme Court’s rationale in Janis permitting the introduction of the challenged evidence equally applicable to the instant case.
Our analysis centers upon a presumed spectrum of deterrence emanating from judicial application of the exclusionary rule. Naturally, the deterrent impact of the exclusionary rule is presumably most effective where evidence obtained by unlawful police conduct is suppressed in a criminal prosecution of a charge substantively related to the acquired evidence. Beyond this, any further increment of deterrent effect must, of logical necessity, decrease. The probable deterrent effect resulting from suppression of illegally obtained evidence in a collateral criminal proceeding such as a prosecution for perjury or contempt by evasive answer, is all the more insubstantial when the evidence is suppressed in a civil proceeding, the gravamen of which is, as in the case of perjury, collateral to the original purpose for obtaining the challenged evidence.
We emphasize that Mancini is not a case such as Matter of Finn’s Liq. Shop v State Liq. Auth. (24 NY2d 647, supra), in which the evidence suppressed at the administrative proceeding to suspend Finn’s liquor license consisted of proof of the underlying violation with which Finn was charged. Nor, as in Finn, was the evidence in this case seized by the agents *32 of, or for the purposes of, the agency conducting the administrative proceeding. On the contrary, the wiretap was placed by the police in good faith upon the telephone of respondent’s cousin, Nanfro, whom they suspected of participation in a narcotics operation. In our view, the deterrent purpose of the exclusionary rule would be little advanced by the insubstantial, if existent at all, probability that the police — if not already deterred by suppression of their acquired evidence in a criminal prosecution charging the crime underlying their investigative efforts — would be deterred from engaging in proscribed conduct by suppression of that evidence in an unrelated civil proceeding.
Thus, we conclude that, on balance, the "length of the road” between the illegal wiretap and the testimony of witnesses Nanfro, Cembrale and Carbonetto, but especially because of respondent’s intervening willful act of perjury, together with the insubstantial benefit to be gained at the expense of the truth-finding process by application of the exclusionary rule militates against suppression of their live testimony.
Having concluded that the testimony of respondents McGrath and Mancini, as well as the live testimony of witnesses Nanfro, Cembrale and Carbonetto, was admissible in the respective proceedings, we address a final contention raised by respondent McGrath: that is, whether the trial court erred in permitting the prosecution, over counsel’s objection, to read to the jury the entire 197 pages of respondent’s Grand Jury testimony, replete with references to underworld crime figures, when the testimony relevant to the contempt charge covered only 10 pages. We agree with respondent that the introduction of his entire Grand Jury testimony was error. While a trial court may in its discretion permit the introduction of background information to enable a jury to comprehend the subject matter of a defendant’s perjury (People v Doody, 172 NY 165), it must strike a proper balance between the benefit gained by the introduction of such evidence as against the highly prejudicial impact which its introduction may work upon the jury. (See People v Standard, 32 NY2d 143.) In the instant case, the benefit alleged by the prosecution as justification for the introduction of respondent’s entire Grand Jury testimony — a demonstration of respondent’s otherwise precise memory — was clearly outweighed by the highly prejudicial impact of this testimony. For this reason, although we have considered and rejected the remainder of respondent *33 McGrath’s contentions, including the contention that his answers were not contumacious, as a matter of law, we believe a new trial is mandated.
Accordingly, the order of the Appellate Division in People v McGrath should be reversed and the case remitted for a new trial. In Matter of Mancini v Codd, the order of the Appellate Division should be reversed and the determination of the Police Commissioner of New York City reinstated.
Chief Judge Breitel and Judges Gabrielli, Jones, Wachtler, Fuchsberg and Cooke concur.
In People v McGrath: Order reversed and the case remitted to Supreme Court, New York County, for a new trial.
In Matter of Mancini v Codd: Order reversed, with costs, and the determination of the commissioner reinstated.

 [4] The People maintain that the defendant, having unsuccessfully challenged the legality of the electronic surveillance before the Grand Jury, may not now again in this criminal contempt proceeding seek to suppress evidence derived through the wiretap. While it would appear that some Federal courts have adopted this rule (see, e.g., United States v Morales, 566 F2d 402, 408), we believe the better rule is to permit a defendant in a criminal contempt proceeding to seek suppression of evidence derived through a wiretap if he has raised this objection before the Grand Jury and, at that time, had sought instruction from the court. (See People v Einhorn, 35 NY2d 948, 949-950.)