OPINION OF THE COURT
Caesar Cirigliano, J.
The defendants are charged with robbery and related offenses for the gunpoint theft of an automobile. The novel question presented in this case is whether police testimony identifying the defendants as being the individuals who were riding in the stolen car when it was stopped is subject to suppression along with the more traditional, tangible fruits of the unlawful stop of that car. I hold that this evidence falls within the ambit of Fourth Amendment proscription and that the suppression of this testimony is necessary to enforce basic constitutional policies.
At the hearing conducted upon the defendants’ motions to suppress, the People’s sole witness was Police Officer Incontrera. Officer Incontrera’s testimony concerning the two constitutionally significant elements of the encounter — the stop of the car and the seizure of the weapon — was seriously impeached by prior inconsistent accounts of these events provided by Officer Incontrera and his partner. Based upon the glaring inconsistencies revealed in his testimony, and upon the manifestly false explanations he manufactured to account for them, I find his testimony unworthy of belief.
At the hearing, under direct examination by the People, Officer Incontrera testified to the following series of events. On September 9, 1990 at 3:29 a.m., Officer Incontrera and his partner, Officer Lewis, drove toward Martense Street and Rogers Avenue in response to two radio transmissions concerning a shooting in that area. Officer Incontrera observed a white Ford that was not the subject of the radio transmissions backing into the intersection of Martense Street and Rogers Avenue. Officer Incontrera turned on his dome light in order to stop the car.
The car stopped and Officer Incontrera pulled his car di *108 rectly in front of the white Ford. Officer Incontrera observed three men in the car, but did not know their names or identities at that time. Officer Incontrera and his partner got out of their car and approached the Ford with their guns drawn. As Officer Incontrera walked toward the passenger door, he saw the front passenger, identified as defendant Mills, bend forward, reach down and then sit up.
Officer Incontrera had Mills step out of the car, and had the driver, identified as Brown, step out of the car on the other side where Officer Incontrera’s partner was standing. When Mills got out of the car, Officer Incontrera claimed that he saw a gun fully exposed to his view on the floor of the passenger seat. At that point, all three men were placed under arrest. After all three defendants were handcuffed and were standing in front of the car with his partner, Officer Incontrera retrieved the gun and handed it to his partner. Officer Incontrera searched Mills and recovered nine .22 caliber rounds from his front pocket.* At the precinct, the police learned that the car was stolen.
Thus, according to Officer Incontrera’s direct testimony, he stopped the white car because he saw it backing up into an intersection. Notably, there was no indication in his memo-book that he had stopped the car for a traffic violation. Instead, his memobook notation indicated that he had stopped the car in connection with a possible crime.
More significantly, in direct contrast to Officer Incontrera’s testimony, the "Request for Commendation” he prepared on September 29, 1990, 11 days later, contains a very different version of these events. The typewritten report provides in pertinent part: "While responding to a radio run of shots fired and a person shot at 130 Martense St., the officers observed a white Ford at the c/o Rogers & Martense. The same white Ford that the officers had attempted to stop but lost 10 min. earlier for baacking [sic] off of Martense St.”
The "Request for Commendation” did not come to light until after Officer Incontrera had testified on direct examination and had been cross-examined by the three defense attorneys. Before this report was located, the officer gave the appearance of being a confident, unhesitant and truthful *109 witness. However, when he was confronted with this report, his manner changed and he became uncertain, somewhat hostile and evasive.
In an unconvincing attempt to reconcile the two versions, Officer Incontrera testified on re-cross-examination, for the very first time, that he had seen a white car passing a red light 10 minutes earlier and that he and his partner thought that it may have been the same white car that had backed into the intersection. When Officer Incontrera was confronted with the fact that the report indicated that he had seen a white car backing through the intersection 10 minutes before he stopped the defendants’ car, he claimed that this was a typographical error. Officer Incontrera asserted that he typed the report inaccurately when he copied it from his handwritten draft.
Officer Incontrera’s attempts to rectify the inconsistencies in his testimony with patently false excuses and amended versions of the events in question is more disturbing than the discrepancies themselves and speaks volumes to his credibility as does the fact that the officers’ accounts of the recovery of the weapon are in direct conflict. Officer Incontrera testified that he observed the gun on the floor of the car when Mills got out of the car and that he retrieved the gun. Officer Lewis, in his Grand Jury testimony, clearly stated that it was he who recovered the weapon and made this same statement in the criminal court complaint. At the hearing, however, Officer Lewis, who testified on behalf of the defense, stated that he did not see the gun on the floor of the car, and saw it for the first time in Officer Incontrera’s hand.
Additionally, I think it appropriate in this case, where major inconsistencies were developed through conflicting accounts contained in Rosario material, to draw an unfavorable inference from the loss of the data analysis sheet which ordinarily would contain a synopsis of statements made by prosecution witnesses. (See, People v Wallace, 76 NY2d 953 [1990].)
Where the legality of a search and seizure is challenged, "the People are * * * put to the burden of going forward to show the legality of the police conduct in the first instance”. (People v Berrios, 28 NY2d 361, 367 [1971].)
Contrary to the People’s contentions, this burden is not met when the proffered testimony suggests a number of possible rationales for the stop of the car and the seizure of its *110 occupants. The court appreciates the variety of choices provided by the police. However, where, as here, credibility is in issue, multiple choice answers are neither desirable nor acceptable. I cannot select a credible version based upon guesswork and will not do so. Indeed, the proliferation of the accounts of the stop of this car and the recovery of the gun is fatal to a finding of credibility and renders the officer’s testimony unworthy of belief.
If the "Judge at the suppression hearing determines that the testimony of the police officer is unworthy of belief, he should conclude that the People have not met their burden of going forward with sufficient evidence and grant the motion to suppress.” (People v Berrios, 28 NY2d, supra, at 369; see also, People v Malinsky, 15 NY2d 86, 91, n 2; People v Aquino, 119 AD2d 464 [1st Dept 1986].) Accordingly, the motion to suppress is granted.
The question now becomes which items of evidence are subject to suppression as the fruits of the unlawful stop of the car and the forcible removal of the defendants from the car. The stop of the car, the removal of the defendants, the discovery of the gun and the search of defendant Mills constitute one continuous chain of events. Thus, the weapon and the bullets are tangible materials that were obtained as a direct result of the unlawful stop and removal of the defendants and are, therefore, suppressed. (See, People v Millon, 69 NY2d 514, 521 [1987].) No intervening events broke the casual chain of connection between the unlawful intrusion and the statement made by Brown at the precinct and consequently, that statement is suppressed. (See, Taylor v Alabama, 457 US 687 [1982]; People v McNeil, 104 AD2d 665 [2d Dept 1984].)
The discovery that these particular defendants were in possession of a car, later discovered to have been stolen, is no less the direct product of the stop of the car and the seizure of its occupants, than the more tangible items of evidence discussed above. The cases make clear that this form of evidence is also subject to suppression.
While "[t]he exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion * * * testimony as to matters observed during an unlawful invasion has [also] been excluded in order to enforce basic constitutional policies.” (Wong Sun v United States, 371 US 471, 485 [1963]; see also, McGinnis v United States, 227 F2d 598 [1st Cir 1955].)
*111 In McGinnis, the court found "no basis in the cases or in logic for distinguishing between the introduction into evidence of physical objects illegally taken and the introduction of testimony concerning objects illegally observed.” (McGinnis v United States, 227 F2d, supra, at 603.) Thus the McGinnis court held that the trial court should have excluded all testimony as to all observations made during an illegal search and not just the testimony concerning the items that were unlawfully seized. Under this rationale, it was held that testimony concerning a missing button observed on a coat that itself was not physically seized during an unlawful search should have been suppressed. (See, Williams v United States, 263 F2d 487 [DC Cir 1959], after remand 482 F2d 867, cert denied 365 US 836 [1961].) In People v Dory (59 NY2d 121, 126-127 [1983]), the New York Court of Appeals reached the same conclusion holding that if the officers’ entry into the defendant’s home had been illegal, "testimony from them concerning physical evidence observed or seized * * * or incriminating actions observed and not attenuated * * * would be inadmissible.”
Thus, observations made during unlawful intrusions fall within the ambit of Fourth Amendment preclusion. It is equally well established that identifications made of defendants are subject to suppression if the identification flowed from an illegal detention. (United States v Crews, 445 US 463 [1980]; People v Dodt, 61 NY2d 408 [1984].)
In this case, it is the defendants themselves that were the "objects” observed and identified during the course of an unlawful intrusion. There is no basis in law or logic to exclude this evidence from the proscriptive scope of the Fourth Amendment.
Indeed, the circumstances here are analogous to those in Davis v Mississippi (394 US 721 [1969]) where the defendant’s identity and connection to the crime was initially discovered through an illegal arrest. In Davis, the police, who were investigating a rape, randomly stopped, interrogated and fingerprinted scores of black youths, among whom was the defendant, Davis. Davis was charged with and ultimately convicted of the rape based upon the fact that his fingerprints matched those found in the victim’s home. Analyzing this situation, the Supreme Court in Crews observed that "[h]ad it not been for Davis’ illegal detention * * * his prints would not have been obtained and he would never have become a suspect.” (United States v Crews, 445 US, supra, at 476.)
*112 Here, the police learned of the identities of the defendants based upon observations and inquiries that flowed directly from the stop of this car and the seizure of its occupants. As such, the identification of these defendants as being the individuals who were in possession of the car, later discovered to have been stolen, is the direct product of a police intrusion for which no valid predicate has been established. Here, as in Davis (supra), had it not been for the unlawful intrusion, the defendants would not have become suspects in the theft of the car. Thus, there is no question that the identification of these defendants is the tainted fruit of the unlawful intrusion and falls within the ambit of the Fourth Amendment’s proscriptions.
However, all such tainted evidence is not automatically barred from use at trial. (People v McGrath, 46 NY2d 12, 21 [1978], cert denied 440 US 972 [1979].) Because the primary purpose of the exclusionary rule is to deter future unlawful police conduct, the probable deterrent effect of the exclusion of tainted evidence must be weighed against its detrimental impact upon the truth-finding process in deciding whether suppression of the tainted evidence is appropriate. (People v McGrath, supra, at 21; People v Young, 55 NY2d 419, 425, cert denied 459 US 848 [1982].)
In this regard, the decision in Young (supra) is instructive. Young was charged with robbery in the first degree for the knifepoint theft of money and food stamps from a grocery store. The trial court suppressed a knife, money and food stamps seized from Young at the time of his unlawful arrest together with the testimony of the victim regarding his identification of the defendant at a showup conducted immediately after the arrest, but declined to suppress testimony concerning the circumstances of the arrest itself. Those members of the Young court that believed that this testimony fell within the proscriptive bounds of the Fourth Amendment, found that its suppression was not necessary because the police were sufficiently penalized for conducting an unlawful arrest by the loss of the knife, money, food stamps and postarrest showup. They concluded that suppression of the testimony concerning the arrest, which did not have a significant probative impact, would not have provided a meaningful deterrent effect upon future unlawful police conduct. (People v Young, 55 NY2d, supra, at 425-426.)
Here, unlike the situation in Young (supra), the suppression of the weapon found in the car, the bullets found on Mills and *113 the ambiguous statement made by Brown at the precinct, will not have a very strong impact upon the strength of the robbery case. The only significant evidence obtained in regard to the robbery of the car was the observation and identification of the defendants in possession of the stolen car. Thus in order to effectuate the Fourth Amendment’s proscription against unreasonable searches and seizures, and afford a meaningful deterrent, this testimony must also be suppressed.

 One hour after the stop of the car, Miranda warnings were given to all of the defendants at the precinct. A few minutes later, Brown, who had been placed in a holding cell, asked the officers, "That’s all we’re under arrest for is the gun? Nothing else?”