Titone, J.
(dissenting). In Matter of Finn’s Liq. Shop v State Liq. Auth. (24 NY2d 647), this Court held, without equivocation, that the exclusionary rule applies to administrative proceedings as well as to criminal prosecutions. Underlying that holding was the Court’s expressed concern that the deterrent effect of the exclusionary rule would be diluted if the fruits of illegal official activity could be used "in order to impose [administrative] sanctions upon the persons whose constitutional rights have been violated” (id,., at 655). Now, a majority of the present Court has chosen to read Matter of Finn’s in the narrowest possible way, limiting its holding to cases in which the law enforcement officials who acted illegally were actually and consciously acting on behalf of, or as agents for, the administrative agency that seeks to use the tainted evidence in its civil proceeding. In so ruling, the majority has created a giant loophole in the exclusionary rule and thereby drastically undermined its salutary deterrent purposes. Because the majority’s analysis establishes yet another "silver platter” for the official use of constitutionally tainted evidence (see generally, Elkins v United States, 364 US 206), I must, respectfully, dissent.
Initially, the majority’s holding is neither compelled nor supported by the existing case law. Since the Court’s decision in Matter of Finn’s Liq. Shop v State Liq. Auth. (supra), the widely recognized general rule has been that the State may not "avail itself of the fruits of * * * unlawful activity,” even in civil disciplinary proceedings, when its agents have traversed the boundaries established by the State and Federal Constitutions (id., at 655; see, People ex rel. Piecarillo v New York State Bd. of Parole, 48 NY2d 76). As was noted by former Justice Breitel in Matter of Leogrande v State Liq. Auth. (25 AD2d 225, 232, revd on other grounds 19 NY2d 418, cited with approval in Matter of Finn’s Liq. Shop v State Liq. Auth., supra, at 655): "The exclusionary rule rests on a theory of deterrence; that policy would not be served if the illegal official activity could be used, despite unavailability in criminal proceedings, to effect parallel sanctions of forfeiture in an administrative proceeding.”
The Court recognized a narrow exception to these principles in People v McGrath (46 NY2d 12, cert denied 440 US 972), on *198 which the majority now relies. However, the holding in McGrath and in its companion civil case, Matter of Mancini v Codd, rested on the straightforward conclusion that the connection between the illegality and the disputed evidence, i.e., certain Grand Jury testimony that was procured indirectly through the use of illegal wiretap information, was too attenuated to warrant application of the exclusionary rule (see, 46 NY2d, at 27-31). Indeed, the Court’s refusal to extend the exclusionary rule to such facts applied both to the criminal proceeding in McGrath and the civil disciplinary proceeding in Mancini. Thus, it is clear that the McGrath holding was premised on the ordinary principles of attenuation analysis that are often invoked in cases involving the scope of the exclusionary rule (see, e.g., United States v Ceccolini, 435 US 268; Brown v Illinois, 422 US 590) — and not on any special concerns about the civil use of evidence that has been suppressed in related criminal proceedings.
Significantly, the McGrath Court was at pains to distinguish the cases before it, which involved "collateral * * * proceeding^] such as * * * prosecution[s] for perjury or [evasive] contempt,” from cases such as Matter of Finn’s Liq. Shop (supra), in which the disputed evidence "consisted of proof of the underlying violation with which [the party to be administratively disciplined] was charged” (46 NY2d, at 31). The same observation can be made in this case, where the evidence petitioner seeks to exclude consists of proof of the underlying violation — possession of marihuana — with which he has been charged.
The Court’s holding in People v Drain (73 NY2d 107), the other case on which the majority relies, is equally unhelpful here. In Drain, the Court merely extended the holding in McGrath to permit the use of evidence obtained directly from police misconduct, as well as evidence indirectly resulting from such misconduct, in a collateral perjury prosecution arising out of the accused’s false Grand Jury testimony about that evidence. The Court’s decision was based on the proposition that suppression in this context would have, at best, marginal deterrent value because of the unforeseeability of the chain of events that led to the defendant’s perjury prosecution (see, 73 NY2d, at 112). In contrast, there is nothing unforeseeable about the likelihood of administrative disciplinary proceedings following a police officer's illegal arrest on drug possession charges, such as occurred in this case. Furthermore, there is nothing "collateral” about an administra *199 tive proceeding that seeks to impose civil penalties for the very misconduct for which criminal prosecution has been foreclosed by virtue of a suppression ruling.
Finally, as is apparent from a review of the relevant cases, the Court has never before suggested, as this majority now does, that the seminal decision in Matter of Finn’s (supra) was meant to be limited to situations in which the officers who conducted themselves illegally were acting as agents of the administrative agency in question. Indeed, such a view of the Court’s position would be difficult to reconcile with the holding in Matter of Malik v New York State Liq. Auth., one of the companion cases in Matter of Finn’s Liq. Shop (supra). In Malik, which also involved misconduct by the Buffalo City Police, there had been no prior contact between the municipal police department and the State licensing agency, and, as here, it was the State, not the local law enforcement authorities, who sought to admit the evidence in an administrative proceeding. Nonetheless, the Court held that the policies underlying the suppression rule foreclosed admission of the illegally obtained evidence at the State administrative hearing. Significantly, in reaching this conclusion, the Court did not rely on, or even allude to, the existence of any agency relationship between the Buffalo City Police and the State licensing entity. The omission of any discussion on the "agency” relationship question is particularly noteworthy, because Malik was clearly distinguishable from its companion cases, Matter of Finn’s and Matter of La Penta, by virtue of what is at least an apparent lack of an "agency” relationship between the officers who obtained the evidence and the entity that proposed to use it. Presumably, such a discussion would have been essential if the Matter of Finn’s Court deemed this factor to be dispositive, as the majority now contends. Given the circumstances in Malik and the absence of any analytical reference to the "agency” problem in that case, it seems clear that the statements from the Matter of Finn’s opinion that the majority quotes here (see, majority opn, at 194) are mere rhetorical flourishes that were never intended to have the critical legal significance that the majority now assigns them.
More fundamentally, the majority’s holding is jurisprudentially flawed because it drastically limits the class of administrative proceedings in which the exclusionary rule will apply in the future and reduces the general rule of suppression that was announced in Matter of Finn’s Liq. Shop (supra) to a minor footnote in the exclusionary rule’s history, having little *200 practical significance. Indeed, the outcome in this case highlights pitfalls of the amorphous "balancing” approach, which requires the Court to measure the potential deterrent effect that a particular application of the exclusionary rule might have and then weigh the societal value of that application against the loss to society that inevitably results from the suppression of otherwise reliable evidence. Applied in certain marginal cases, this "balancing” approach can serve to weed out instances in which the deterrent value of the exclusionary rule is too insignificant to warrant the consequent impairment of the truth-finding process (see, e.g., People v Drain, supra; People v McGrath, supra). On the other hand, if applied as the sole guiding principle, the "balancing” approach, which has no real objective criteria, can lead to result-oriented decision-making and, ultimately, to the devaluation of the exclusionary rule as an important component of our system of constitutional enforcement.
The problem with a "balancing” approach is that there are no specific, uniformly applicable scales for measuring the relative weight to be assigned to the two factors that are being compared, i.e., the deterrent value of applying the exclusionary rule in the particular context and the loss to society arising from the suppression of otherwise probative evidence. The vocabulary of the "balancing” approach thus can be used to justify virtually any outcome, depending on the subjective beliefs that the individual decision-makers have about the merits of the exclusionary rule.
Furthermore, in most instances, the "balancing” approach is inherently weighted against application of the exclusionary rule, since it focuses on the facts in the individual situation before the Court rather than the broader societal concerns that led to the development of the suppression principle. As one noted commentator has observed, the exclusionary rule is aimed at general, not specific, deterrence, and its effectiveness depends upon removing the inducements to violate Fourth Amendment rights that may exist in the over-all system, rather than on sanctioning noncompliance in particular cases (1 LaFave, Search and Seizure § 1.7 [d], at 154 [2d ed], quoting United States v Peltier, 422 US 531, 557 [Brennan, J., dissenting]). A formula such as that utilized by the majority here, which weights deterrent value by considering only the likely effect of penalizing misconduct in the specific context, almost necessarily depreciates that side of the equation, making it all but impossible to overcome the self-evidently weighty value of *201 assuring the accuracy of the truth-finding process (majority opn, at 196).
In this case, for example, the majority has focused on what these particular arresting officers "could * * * have foreseen, when they searched [petitioner’s] vehicle” (majority opn, at 196), rather than on the broader deterrent value of a rule that, in general, precludes the use of illegally obtained evidence in official proceedings aimed at penalizing the accused’s misconduct. In so doing, the majority has trivialized the exclusionary rule and completely disregarded the rule’s true purpose — to remove any significant incentives that our legal system may provide to law enforcement personnel who may be inclined to violate suspects’ constitutional rights (Mapp v Ohio, 367 US 643, 656).
Manifestly, the possibility that the fruits of illegal police conduct may be used to extract a "parallel” civil penalty despite the unavailability of criminal sanctions provides a material incentive to disobey constitutional strictures (see, Matter of Leogrande v State Liq. Auth., supra, at 231-232). It matters not that the precise civil penalty, e.g., dismissal from employment or loss of license, may not have been foreseen, "for it is nonetheless true that admission of the evidence would constitute an 'inducement to subterfuge and evasion’ ” (1 LaFave, op. cit., at 154). In this highly regulated society, the likelihood that some civil consequence will flow from a violation of penal law is sufficiently substantial to furnish an inducement to official misconduct. As the Court noted in Matter of Finn’s Liq. Shop (supra, at 653), "[t]o the extent that the State, or its agents, can bypass the deterrent effect of the exclusionary rule by using the fruits of an illegal search in a 'civil’ or 'administrative’ proceeding, the incentive for enforcement and investigative personnel to exceed constitutional limitations on their activity remains and the effectiveness of the rule as a deterrent is diminished.”
In sum, there is simply no precedent for making the availability of the exclusionary rule turn on the nature of the charged misconduct or the identity of the party to be charged. Those considerations did not play a part in the decisions in People v Drain (supra), Matter of Finn’s (supra), People v McGrath (supra) or in McGrath’s companion case, Matter of Mancini v Codd, in which the petitioner also happened to be a police officer. They should not be introduced into the analysis here, since the use of such criteria further promotes subjectivity in the decision-making process.
*202 In sum, there has been nothing in the development of the law in the 24 years since Matter of Finn’s Liq. Shop (supra) was decided that undermines the elemental wisdom of that observation. Neither the "balancing” approach invoked in People v Drain (supra) nor the "attenuation” analysis utilized in People v McGrath (supra) diminishes the basic tenet that the purposes of the exclusionary rule are well served by its application in the administrative context. Since the majority’s holding in this case accords little weight to that important tenet and, in fact, all but overrides it, I cannot concur in the Court’s decision to reverse. In my view, the court below properly held that the evidence resulting from the unlawful search of petitioner’s car should not have been admitted at the administrative disciplinary hearing and, consequently, its judgment should be affirmed.
Chief Judge Kaye and Judges Simons, Hancock, Jr., and Bellacosa concur with Judge Smith; Judge Titone dissents and votes to affirm in a separate opinion.
Judgment reversed, etc.