People ex rel. Gordon v O'Flynn (2004 NY Slip Op 24136)

People ex rel. Gordon v O'Flynn

2004 NY Slip Op 24136 [3 Misc 3d 963]

April 21, 2004

Supreme Court, Monroe County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, July 14, 2004

[*1]
The People of the State of New York ex rel. Tyrone Gordon, Petitioner,
v
Patrick O'Flynn, as Monroe County Sheriff, et al., Respondents.
Supreme Court, Monroe County, April 21, 2004

APPEARANCES OF COUNSEL

Edward J. Nowak, Public Defender (Leanne G. Staropoli of counsel), for petitioner. Eliot Spitzer, Attorney General (Charles D. Steinman of counsel), for respondents.

{**3 Misc 3d at 963} OPINION OF THE COURT

Kenneth R. Fisher, J.
{**3 Misc 3d at 964}A decision nearly a quarter of a century ago in People ex rel. Piccarillo v New York State Bd. of Parole (48 NY2d 76 [1979]) held that the Fourth Amendment exclusionary rule applies in parole revocation proceedings in this state. A number of subsidiary rules were established. Because a hearing officer in the parole revocation proceeding cannot make the decision whether evidence should be suppressed (People ex rel. Robertson v New York State Div. of Parole, 67 NY2d 197 [1986]; Matter of Finn's Liq. Shop v State Liq. Auth., 24 NY2d 647, 657 n 2 [1969]; People ex rel. Victory v Travis, 288 AD2d 932, 933 [4th Dept 2001] ["Hearing Officer has no authority to rule on suppression issues"]; Matter of Schoenwandt v New York State Div. of Parole, 240 AD2d 415, 416 [2d Dept 1997]; People ex rel. Coldwell v New York State Div. of Parole, 123 AD2d 458 [2d Dept 1986]), a special procedure was devised under CPLR article 70 to permit consideration of such claims, to hold hearings, and to determine the claim, upon findings of fact and conclusions of law, when a criminal court has not made a " 'prior judicial determination' " of the same in the context of a criminal prosecution. (People ex rel. Johnson v New York State Div. of Parole, 299 AD2d 832, 833 [4th Dept 2002], quoting People ex rel. Victory v Travis, 288 AD2d at 933; cf., People ex rel. Derby v Williams, 206 AD2d 831, 831 [4th Dept 1994] ["exclusionary rule is not implicated" when a petitioner's suppression motion is denied, after a hearing, in a prior criminal action].) In some cases, such as this one, due process requires [*2]that the final revocation proceeding be adjourned pending resolution of the suppression issue in Supreme Court or the applicable criminal court. (People ex rel. Matthews v New York State Div. of Parole, 58 NY2d 196 [1983].)
This regime has percolated through our court system since 1979 and this habeas corpus proceeding is an example. The criminal action resulting from the police conduct challenged in this proceeding was not fully prosecuted by the district attorney, leaving the suppression issue unresolved in criminal court. This habeas corpus petition was filed after the preliminary parole revocation proceeding. A hearing was ordered to determine whether petitioner's Fourth Amendment rights (or rights under NY Const, art I, § 6) were adhered to. Petitioner contends that he should be granted relief if the court finds that his Fourth Amendment or state constitutional rights under article I, § 6 were infringed.
In 1998, however, the United States Supreme Court held that the exclusionary rule does not in general extend beyond "proceedings other than criminal trials," and in particular does not {**3 Misc 3d at 965}extend to state parole revocation proceedings. (Pennsylvania Bd. of Probation & Parole v Scott, 524 US 357, 363 [1998]; see also, United States v Armstrong, 187 F3d 392, 393-394, 394-395 [4th Cir 1999].) In the nearly six years since Scott was decided, no treatment of that decision appears in the reported New York decisions. Because there is no statutory or regulatory authority that the exclusionary rule must be applied in parole revocation proceedings (Executive Law § 259-i; 9 NYCRR part 8005), and because the regulations state that "formal rules of evidence observed by courts need not be followed," excepting rules of privilege (9 NYCRR 8005.2 [a]), the question devolves to whether the Scott decision abrogates Piccarillo.[FN1] 

It does, for the following reasons.

A. The Facts: What Constitution was Violated, if Any

According to the police testimony at the hearing, petitioner discarded, and therefore abandoned, the cocaine while absconding from police pursuit of him in Jones Park, north of the intersection of Saratoga Street and Lyell Avenue in the City of Rochester. (See generally, People v Ramirez-Portoreal, 88 NY2d 99, 110-111 [1996].) The leader of a team of officers that stopped petitioner and recovered the cocaine acknowledged that he saw nothing in petitioner's behavior that was suspicious or furtive as he and his companion rode their bicycles through the park. They acted solely on the orders of Investigator Muller in pursuing and stopping petitioner.
Investigator Muller testified that he saw petitioner near a corner store at 199 Lyell Avenue while patrolling in an unmarked police car in the late evening hours of September 25, 2003. He saw petitioner bend down and place an otherwise nondescript clear plastic sandwich bag on the ground. Petitioner covered it up with dirt. Muller drove on by, and looked back to see petitioner bend down again in an apparent effort to retrieve the bag from the ground. Muller did not actually see the bag in petitioner's hand at that point, however, nor did he see petitioner engage in a transaction with someone else. Petitioner then rode away with a companion on [*3]bicycles, in unremarkable fashion, north toward Jones Park. Investigator Muller observed no other furtive or otherwise suspicious behavior. He provided his {**3 Misc 3d at 966}expert opinion, however, that petitioner's behavior was consistent with those who engaged in cocaine distribution activities. Muller explained that this was a high crime area, that cocaine was the primary drug of choice there (over marijuana, thus attempting to distinguish petitioner's putative criminal activity from those only committing violations of the law), and that he had observed no one in that area in his experience who actually carried a sandwich in a clear plastic sandwich bag. Investigator Muller, however, could not identify the contents of the bag given the distance involved, nor did he observe petitioner, or his companion for that matter, engage in any other of the telltale signs of criminal drug activity. Nevertheless, he gave the order over the radio to stop petitioner, and saw one of the at least six units which responded approach petitioner near Jones Park.
Because Officer Lembke's actions upon hearing the order over the radio, together with that of the other six or more units which responded to Jones Park, cannot be characterized as anything less than a "pursuit" of petitioner (Lembke activated his spotlights and drove his marked police car up over the curb and onto the grass and sidewalk of the park itself as he followed petitioner), this case is controlled by People v Howard (50 NY2d 583 [1980]). The police here, as in Howard, had the right to make a so-called level two De Bour intrusion,[FN2] 

i.e., make inquiry of petitioner (50 NY2d at 589), but they could not without more justify anything other than continued "unobtrusive" observation of petitioner. (50 NY2d at 592; see also, People v Pines, 99 NY2d 525, 526 [2002] [reasonable suspicion necessary to "justif(y) pursuit"]; People v Ross, 251 AD2d 1020 [4th Dept 1998]; People v Hope, 237 AD2d 885 [4th Dept 1997] [same].)
Howard has since been limited, especially in its suggestion that police may not in such circumstances take into consideration a suspect's flight from officers before pursuit begins. (See People v Jones, 69 NY2d 853 [1987]; People v Leung, 68 NY2d 734 [1986].) In People v Martinez (80 NY2d 444 [1992]), the Court confirmed that flight may be considered in the decision to pursue a suspect, but held that reasonable suspicion is necessary to pursue a suspect and that flight alone is not enough to reach that threshold. (80 NY2d at 447-448.) Here, respondents do not rely on flight, because the police acknowledged that petitioner's behavior, other than the secreting of the sandwich bag {**3 Misc 3d at 967}under the dirt (and later supposed retrieval, because Muller did not see the object retrieved), was not furtive or otherwise suspicious. According to Lembke, petitioner did not "immediately take off" or otherwise flee when he turned around in the park to notice the marked squad car rapidly approaching, but instead "[j]ust continued riding on his bike."
Lembke's opinion that he was just "following them" in the park, and that he "wouldn't say it was a pursuit," cannot be credited. Lembke was one of "at least six" units responding to Muller's radio call to stop petitioner in the park. He drove his squad car up over the curb into the grass and sidewalk in rapid approach, and ordered petitioner to stop, in close proximity and with the aid of a standard issue spotlight. In other testimony that the court credits, Lembke described it as "more of a simultaneous kind of thing to spotlight him, a[c]quire him, make my intentions [*4]known to them after they were spotlighted or at the time." (Emphasis supplied.) This is by any measure "pursuit" within the meaning of Howard and its progeny. In any event, after the order to stop, when petitioner "just continued riding" without fleeing or making other furtive gestures before discarding the plastic bag, Lembke's continued close pursuit is also subject to Howard scrutiny.
It is this aspect of the case that distinguishes it from People v Pines (99 NY2d 525 [2002]) and Matter of Steven McC. (304 AD2d 68, 72-73 [1st Dept 2003]). Pursuit of petitioner began the moment Officer Lembke heard Investigator Muller's order to stop petitioner; Lembke was pursuing, with at least six other units, before anything resembling flight occurred. The indicia of criminal activity observed by police before petitioner's ultimate attempt to discard the bag would not rise to the level of reasonable suspicion justifying the pursuit. In Pines and Steven McC., on the other hand, the suspects noticed the police investigators upon their approach at the outset, and immediately made visceral reactions of surprise and alarm, and then made continuously suspicious, furtive and evasive gestures before the police elevated the encounter to a level three intrusion. (304 AD2d at 72-73; see Illinois v Wardlow, 528 US 119, 125 [2000] ["unprovoked flight is simply not a mere refusal to cooperate . . . (but), by its very nature, is not 'going about one's business'; in fact, it is just the opposite"].) In this case, the pursuit in this high crime area began almost immediately (cf., People v McIntosh, 96 NY2d 521, 526-527 [2001]), and was not supported by reasonable suspicion as that term is interpreted under NY Constitution, article I, § 6.{**3 Misc 3d at 968}
The case is functionally indistinguishable from People v May (81 NY2d 725 [1992]) and People v Holmes (81 NY2d 1056 [1993]), and should be contrasted with People v Matienzo (81 NY2d 778 [1993]), which involved an observed exchange of a small plastic bag for money and subsequent flight upon the approach of the police. The police in this case had no more founded suspicion than the police had in People v Reyes (83 NY2d 945 [1994]) and People v Hill (302 AD2d 958, 959 [4th Dept 2003]), both of which sanctioned only a level two common-law inquiry. Yet the police activity here well exceeded what occurred in Reyes, especially because it involved pursuit of petitioner, using a squad car to drive into the park area, and use of the spotlight, and an order to defendant, who was on his bicycle, to effectively "pull-over." (People v May, 81 NY2d at 727.) Even if the initial command to stop may be viewed as unobtrusive and not a seizure under New York law (I would find otherwise if it were necessary [see People v Bora, 83 NY2d 531, 535-536 (1994)]), petitioner had in the circumstances a right to continue riding, as indeed he did, thus entitling the police only in "keep[ing him] under observation" until further indicia of criminality was observed. (People v May, 81 NY2d at 728; see People v Holmes, 81 NY2d at 1058.) Because they instead pursued petitioner immediately upon receiving Investigator Muller's order to stop, and because such pursuit was not then justified by reasonable suspicion (because Lembke conceded that he saw nothing of a suspicious or furtive character during his observation of petitioner while pursuing him until the bag was discarded), petitioner's act of dropping the cocaine to the ground, which occurred subsequent to Lembke's attempt to stop petitioner in the park, was in response to unlawful police activity and may not be considered an abandonment under our law. (People v Ramirez-Portoreal, 88 NY2d at 110.)
This is, however, as alluded to above, only a violation of our State Constitution. (People v Bora, supra.) The police did not "seize" petitioner within the meaning of the Fourth Amendment, [*5]even when they pursued him with the objective of seizure, before the physical seizure actually occurred. (California v Hodari D., 499 US 621, 626 [1991].) "[N]o Fourth Amendment seizure would take place where a 'pursuing police car sought to stop the suspect only by the show of authority represented by flashing lights and continuing pursuit.' " (County of Sacramento v Lewis, 523 US 833, 844 [1998], quoting Brower v County of Inyo, 489 US 593, 597 [1989]; see Matter of Steven McC., 304 AD2d {**3 Misc 3d at 969}at 71 [under Fourth Amendment].) Therefore, petitioner's act of abandonment of the cocaine during the pursuit cannot be said to be in response to police action which violated the Fourth Amendment.
With the identification of which constitutional provision, state or federal, was violated, the question turns to the proper remedy in this proceeding, if any.

B. The Viability of Piccarillo

Piccarillo was one of a series of decisions in the late 1960's and 1970's which held that the exclusionary rule applied in administrative proceedings. (Piccarillo, 48 NY2d at 81 [collecting cases, including People v McGrath (46 NY2d 12, 21 [1969]) and Matter of Finn's Liq. Shop v State Liq. Auth. (24 NY2d 647 [1969])].) In none of these cases was a separate state constitutional rule considered. In Finn's Liq. Shop, the Court considered only "whether the exclusionary rule of Mapp v. Ohio (367 U. S. 643 [1961]) applies to administrative proceedings as well as to criminal prosecutions." (24 NY2d at 653.) Federal law was cited throughout the opinion. In McGrath, the Court in two actions addressed only "whether in a criminal contempt proceeding the Fourth Amendment requires suppression of defendant's testimony before the Grand Jury as the fruit of an illegal wiretap," and "whether, in a civil disciplinary proceeding in which a policeman is charged with perjury, the Fourth Amendment requires the suppression [of certain testimony], as fruit of an illegal wiretap." (People v McGrath, 46 NY2d at 20.) Resolution of both issues was made under the formula of United States v Calandra (414 US 338, 347-348 [1974]) and other federal exclusionary rule cases. (People v McGrath, 46 NY2d at 21-22, 26-28, 30-31.) Finally, in Piccarillo itself, the Court simply extended the holdings in McGrath and Matter of Finn's Liq. Shop, both cases involving an interpretation of the Fourth Amendment exclusionary rule (as stated above), and both of which established the general proposition that "[i]t can no longer be disputed that the exclusionary rule is applicable to administrative . . . proceedings in New York" (Piccarillo, 48 NY2d at 81), to parole revocation proceedings in particular.
To be sure, as petitioner contends, the court distinguished lower level federal cases, and others from sister states, which had concluded otherwise. (Piccarillo, 48 NY2d at 81 n 6.) But the federal cases and the state decisions were in conflict at that time on the federal issue. No effort was made in Piccarillo to create a separate state constitutional rule. As the court later observed {**3 Misc 3d at 970}(Matter of Patchogue-Medford Congress of Teachers v Board of Educ. of Patchogue-Medford Union Free School Dist. 70 NY2d 57 [1987]), the isolated reference to the State Constitution in Piccarillo served only to underscore that "this court has traditionally rested its decisions [in search and seizure cases] on both State and Federal grounds when it appears that they both support the result reached." (70 NY2d at 66 [emphasis supplied], citing, inter alia, Piccarillo.) Notably, the Court in Piccarillo did not engage in the substantial exegesis traditionally undertaken by the Court of Appeals when it is creating a separately [*6]enforceable state constitutional standard. (See e.g., People v Harris, 77 NY2d 434, 437-439 [1991] ["detail(ing) some general rules governing independent State review," including that a "noninterpretive analysis of the State provision" is required which "focuses not on the text of the clause but on matters peculiar to this State," and whether "the Supreme Court's rule is not adequate to protect New York citizens"]; see also, People v Robinson, 97 NY2d 341, 351 [2001] ["(n)one of the reasons for extending protections of our Constitution beyond those given by the Federal Constitution exist here"]; People v Scott, 79 NY2d 474 [1992] [and cases there collected]; People v Johnson, 66 NY2d 398, 406-407 [1985].)
Furthermore, this court has found no case in which the Court of Appeals referred to Piccarillo as involving an interpretation of the State Constitution broader than its federal counterpart. (See e.g., the cases cited above and, especially, People v Robinson, 97 NY2d at 350 [Smith, J.], at 367 [Levine, J., dissenting] [both opinions cataloging the decisions in which the Court "has not hesitated to expand the rights of New York citizens beyond those required by the Federal Constitution"].) Nor do the leading commentators attempt to place Piccarillo in the state constitutional jurisprudence category. (See e.g., Robert M. Pitler, Independent State Search and Seizure Constitutionalism: The New York Court of Appeals' Quest for Principled Decisionmaking, 62 Brooklyn L Rev 1, 14-15, 17 n 33 [cataloging all of the cases holding that art I, § 6 provides more protection than the Fourth Amendment], at 213-215 n 827 [describing Piccarrillo as having been "decided before the dawn of active New York State constitutionalism"]; Peter J. Galie, Symposium: State Constitutional Law: Adjudication and Reform, The Court and The Changing Constitution: A Discussion, 13 Touro L Rev 135, 162 [1996] [until the decision in People v Johnson (66 NY2d 398 [1985]), "(w)hen the court has addressed the role of the exclusionary {**3 Misc 3d at 971}rule, it has done so solely in a federal context"], at 163 ["In no case has the court of appeals made an explicit decision to adopt a state based exclusionary rule to determine the status of the rule, or to articulate its relationship to the federally based rule"].)[FN3] 

Finally, the cases of People ex rel. Johnson v New York State Div. of Parole (supra) and People ex rel. Victory v Travis (supra), relied on by petitioner, do not help him, because the abrogation issue was not raised in either case.
Accordingly, the Supreme Court's decision in Scott is held to abrogate Piccarillo, and the court finds that no separate state constitutional rule has been created which calls for application of the exclusionary rule to parole revocation proceedings. There may or may not be reasons supporting the extension of a separate state constitutional or other exclusionary rule to parole revocation proceedings, even in the face of the 1938 Constitutional Convention's express refusal to adopt an exclusionary rule for article I, § 6 violations (People v Richter's Jewelers, 291 NY 161, 168-169 [1943]; see generally, Peter J. Galie, Ordered Liberty: A Constitutional History of New York, at 236 [1996]; Robert M. Pitler, supra, 62 Brooklyn L Rev, at 86-97), but they are not for a state Supreme Court justice to consider in the first instance. The exclusive policy making arm of the New York judiciary is the New York Court of Appeals; not trial courts, nor even the Appellate Divisions, may create separate state constitutional rules on their own. (People v [*7]Lucas, 183 Misc 2d 639, 644 [Sup Ct, Monroe County 1999] [collecting cases].) Particularly in a case such as this, in which such an adventure would appear to put this state in a dwindling and slim minority in applying the exclusionary rule to parole revocation proceedings, it would be inappropriate for this court to announce such a rule for the first time.
The court notes that, when last confronted with the issue whether the exclusionary rule applied in administrative proceedings, the Court of Appeals retreated quite dramatically from the bold and general statements made in Matter of Finn's Liq. Store and Piccarillo, i.e., that the rule was generally applicable in administrative proceedings. (Matter of Boyd v Constantine, 81 NY2d 189 [1993] [exclusionary rule inapplicable in administrative disciplinary proceeding against a state trooper]; cf., Matter of Juan C. v Cortines, 223 AD2d 126, 131 [1st Dept 1996] [applying{**3 Misc 3d at 972} the exclusionary rule to school disciplinary proceedings and applying collateral estoppel to a Family Court suppression order], revd 89 NY2d 659 [1997] [denying collateral estoppel effect to a Family Court suppression order without reaching the exclusionary rule issue].) The court is also fortified in its decision that the Court of Appeals administers the exclusionary rule for state constitutional purposes on an individual case basis by the recent holding in People v Jones (2 NY3d 235 [2004]), which declined to extend the exclusionary rule created in People v Harris (77 NY2d 434 [1977]) to post-Payton violation identification situations.

Conclusion

For the reasons stated above, the petition is denied.

Footnotes

Footnote 1: Petitioner observes in a memorandum that the court raised this issue with the parties just prior to the taking of testimony. Respondents have since filed a memorandum formally raising whether Piccarillo was abrogated by Scott. Petitioner requested, and was granted, time to file papers on the issue. He raises no objection to the court's consideration of the issue in those papers.

Footnote 2: See People v Hollman, 79 NY2d 181, 190 (1992); People v De Bour, 40 NY2d 210, 223 (1976).

Footnote 3: There is a student comment to the contrary (see Note, Suppress or Suspend: New York's Exclusionary Rule in School Disciplinary Proceedings, 72 NYU L Rev 1494, 1508-1509 [1997]), but it is not persuasive on the point.